**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **DOROTHY GASIOROWSKI-WATTS,** | |
| **Plaintiff,** | **Civil Action No. 1:23-cv-01043-DCN** |
| **v.** | **District Judge:  Donald C. Nugent** |
| **CSX TRANSPORTATION, INC.** | |
| **Defendant.** | |

**CSX TRANSPORTATION, INC.'S MEMORANDUM IN**
**<u>SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT</u>**

Dated: June 7, 2024

*/s/ Elaine Rogers Walsh*

Elaine Rogers Walsh (*pro hac vice*)
Patrick M. Corley (*pro hac vice*)
JONES DAY
1221 Peachtree Street, N.E., Suite 400
Atlanta, GA  30361
Telephone:  404.581.3939
Facsimile:  404.581.8330
Email: erogerswalsh@jonesday.com
          pcorley@jonesday.com

Yaakov M. Roth (*pro hac vice*)
JONES DAY
51 Louisiana Avenue, NW
Washington, D.C.  20001
Telephone:  202.879.3939
Facsimile:  202.626.1700
Email:  yroth@jonesday.com

Elizabeth L. Dicus (No. 0081219)
JONES DAY
325 John H. McConnell Boulevard
Suite 600
Columbus, OH  43215
Telephone:  614.469.3939
Facsimile:  614.461.4198
Email:  eldicus@jonesday.com

Samuel V. Lioi (No. 100464)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone:  216.586.7135
Facsimile:  216.579.0212
Email:  slioi@jonesday.com

*Attorneys for*
*CSX Transportation, Inc.*

**TABLE OF CONTENTS**

**Page**

SUMMARY OF THE ARGUMENT ........................................................................ 2

I.    STATEMENT OF FACTS ...................................................................... 4

    A.    CSX's Operations and Watts' Employment ................................. 4

    B.    Procedures for Lodging Safety Concerns ..................................... 5

    C.    CSX Disciplinary Policies and Procedures.................................... 5

    D.    ERAD System and Outdated Educational Memoranda ................ 7

    E.    Watts Reports that She Operated Her Train Over the Speed Limit ............................. 8

    F.    CSX'S ERAD System Catches Watts Speeding Again........................ 8

    G.    Field Administration Classifies the Charges, CSX Holds and Investigation, and Dismisses Watts ............................................ 9

    H.    Alleged Protected Activity............................................................ 11

    I.    Comparator Discipline ................................................................. 12

    J.    Procedural History ....................................................................... 13

II.    ARGUMENT ...................................................................................... 13

    A.    The Court Should Grant Summary Judgment............................... 13

    B.    Watts Cannot Establish a Prima Facie Case of FRSA Retaliation ............................. 14

        1.    The Relevant CSX Managers Did Not Know that Watts Engaged in Alleged Protected Activity ................................ 14

    C.    Watts Cannot Prove That Her Dismissal Was Retaliatory ......................... 17

        1.    Watts Cannot Rely on Timing to Prove Her Claim ............... 18

        2.    Watts' Intervening Operating Rules Violation Destroys Any Inference of Contributing Factor .............................. 20

        3.    Watts Cannot Show That the Manager Who Dismissed Her Did Not Honestly Believe That She Violated CSX's Operating Rules By Speeding....................... 22

        4.    Watts' Discipline Complied With CSX Policy and Was Consistent With Discipline Imposed on Similarly-Situated Employees ....................... 24

        5.    Watts Has Not Proven Antagonism or Hostility Towards Her Protected Activity 24

        6.    There are No Other Indicia that Watts' Alleged Protected Activity Was a Contributing Factor in Her Dismissal ................................. 25

    D.    Even If Watts Could Establish a Prima Facie Case, CSX Has Proved By Clear And Convincing Evidence That It Would Have Disciplined Her Notwithstanding Her Alleged Protected Activity ................................................ 26

CONCLUSION.................................................................................................... 29

## TABLE OF AUTHORITIES

**Page**

CASES

*BNSF Ry. Co. v. U.S. Dep't of Labor*,
816 F.3d 628 (10th Cir. 2016) ........................................................................18, 20

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) .........................................................................................13

*Consol. Rail Corp. v. Dep't of Labor*,
567 Fed. App'x. 334 (6th Cir. 2014) ................................................................14

*Dafoe v. BNS Ry. Co.*,
164 F. Supp. 3d 1101 (D. Minn. 2016) .............................................................19

*Gunderson v. BNSF Ry. Co.*,
850 F. 3d 962 (8th Cir. 2017) ....................................................................17, 23

*Hand v. CSX Transportation, Inc.*,
2021 WL 963584 (N.D. Ohio Mar. 15, 2021) ............................................... passim

*Heim v. BNSF Ry. Co.*,
849 F.3d 723 (8th Cir. 2017) ..........................................................................18

*Imwallwe v. Reliance Med. Prods.*,
515 F.3d 531 (6th Cir. 2008) .....................................................................19, 20

*James v. Norfolk S. Ry. Co.*,
2024 WL 1242311 (N.D. Ohio Mar. 22, 2024) .................................................24

*Johnson v. Stein Mart, Inc.*,
440 F. App'x 795 (11th Cir. 2011) ...................................................................27

*Kenney v. Aspen Technologies, Inc.*,
965 F.3d 443 (6th Cir. 2020) ...........................................................................19

*Koziara v. BNSF Ry. Co.*,
840 F.3d 873 (7th Cir. 2016) .....................................................................17, 24

*Kuduk v. BNSF Ry. Co.*,
768 F.3d 786 (8th Cir. 2014) .....................................................................14, 27

*Lee v. Norfolk S. Ry. Co.*,
187 F. Supp. 3d 623 (W.D.N.C. 2016) ...................................................................27

*Lemon v. Norfolk So. Ry. Co.*,
958 F.3d 417 (6th Cir. 2020) ...........................................................17, 18, 20, 24

*Mangold v. Norfolk S. Ry. Co.*,
2020 WL 7334679 (N.D. Ohio Dec. 14, 2020) ...................................18, 20, 27, 28

*Mangold v. Norfolk S. Ry. Co.*,
2021 WL 5904091 (6th Cir. Dec. 14, 2021) ................................................. *passim*

*Michael v. Caterpillar Fin. Servs. Corp.*,
496 F.3d 584 (6th Cir. 2007) .................................................................................22

*Mittman v. City of Toledo*,
156 F.3d 1231 (6th Cir. 1998) ..............................................................................19

*Reid v. Neighborhood Assistance Corp. of Am.*,
749 F.3d 581 (7th Cir. 2014) ................................................................................19

*Ryan v. CSX Transportation, Inc.*,
2019 WL 3254129 (S.D. Ohio July 19, 2019) ......................................................17

*Wasek v. Arrow Energy Servs., Inc.*,
682 F.3d 463 (6th Cir. 2012) ................................................................................18

*Wright v. Murray Guard*,
455 F.3d 702 (6th Cir. 2006) ................................................................................23

**STATUTES**

49 U.S.C. § 20109(d)(2)(A)(i) ...............................................................................17

49 U.S.C. § 42121(b)(2)(B)(ii) ..............................................................................14

49 U.S.C. § 42121(b)(B)(iv) ..................................................................................26

**OTHER AUTHORITIES**

29 C.F.R. § 1982.109(a)........................................................................................17

## LOCAL RULE 7.1(F) STATEMENT OF ISSUE TO BE DECIDED

The issue to be decided in CSX Transportation Inc.'s ("CSX's") Motion for Summary Judgment is whether Plaintiff Dororthy Gasiorowski-Watts can show there is any genuine dispute of material fact regarding her clam that CSX intentionally retaliated against her for engaging in protected activity under the Federal Railroad Safety Act, 49 U.S.C. 20109.

## SUMMARY OF THE ARGUMENT

CSX's Operating Rules prohibit train crews from speeding. On January 13, 2018, less than six months after Plaintiff Dorothy Gasiorowski-Watts ("Watts") admitted responsibility for speeding while operating a locomotive, CSX's electronic monitoring system (also known as "ERAD") detected her speeding a second time. CSX's ERAD team notified Trainmaster Michael Berghaus ("Berghaus") of the ERAD data. Berghaus analyzed the ERAD data, confirmed that it showed Watts speeding, and entered an assessment of a potential violation of CSX's Operating Rules into CSX's Field Administration System against both Watts and her conductor, as he was required to do.

CSX's Field Administration team in Jacksonville then reviewed the assessments, and concluded that, under CSX's disciplinary policy then in effect (called the "IDPAP"), charges of a potential violation of CSX's Operating Rules should be issued to both Watts and her conductor. Further, Field Administration classified both charges under the terms of CSX's disciplinary policy. The charge against the conductor was classified as a "non-major" offense because it was his first potential speeding violation within three years, but the charge against Watts was classified as "major" because it was her second potential speeding violation within three years. As mandated by the employees' collective bargaining agreements ("CBA") with CSX, Watts and her conductor participated in an investigation hearing to determine whether they were responsible for the overspeed incident, during which they were each represented by a union officer, each permitted to present testimony and evidence on their own behalf, and each permitted to cross-examine CSX's witnesses.

Following the investigation hearing, a higher level CSX manager not involved in the hearing, Shaun Rosselli ("Rosselli"), CSX's Superintendent of the Midwest Zone at the relevant

time, decided that both employees violated CSX's Operating Rules on speeding and imposed discipline. In making those decisions, Rosselli independently reviewed the investigation hearing transcript along with the relevant exhibits, including the ERAD data. After concluding that both employees violated the Operating Rules, Rosselli gave both the maximum discipline available under the IDPAP. For Watts, this was termination, because it was her second speeding violation within six months; for the conductor, it was a 15 day suspension, because it was his first violation. CSX dismissed Watts on February 23, 2018.

Watts now contends that CSX disciplined her in violation of the Federal Railroad Safety Act, 49 U.S.C. § 20109 ("FRSA"). Specifically, she claims that CSX disciplined her because in the months leading up to her dismissal, she allegedly faxed several safety forms to CSX's terminal office in Collinwood, Ohio and contacted the Federal Railroad Administration ("FRA") regarding an alleged "hours of service" violation involving Berghaus. Watts' claims are baseless.

*First*, Watts cannot show that the relevant CSX managers knew of her claimed protected activity. Berghaus never received a copy of the safety forms Watts allegedly faxed in late 2017. Further, the FRA has no record that Watts made a complaint in December 2017 and, therefore, the FRA did not (and could not) contact Berghaus, or anyone else at CSX, regarding the alleged complaint. More importantly, Field Administration, which issued and classified the charge against Watts, and Rosselli, the manager who made the discipline decision, unquestionably had no knowledge of Watts' alleged protected activity.

*Second*, Watts cannot show that her alleged protected conduct contributed to CSX's decision to discipline her. Instead, the undisputed facts show the CSX managers involved in the assessment, classification, and decision to terminate took those actions for one reason: the ERAD

data demonstrated that Watts operated her locomotive over the authorized speed restriction in violation of CSX's Operating Rules twice in a period of six months.

*Finally*, even if there was any evidence linking Watts' alleged protected conduct to her discipline, CSX has established that it would have taken the same action notwithstanding the allegedly protected conduct. Speeding is significant misconduct, and CSX routinely disciplines employees who do so. And, CSX regularly dismisses employees who do so twice in a three-year period. In other words, Watts was treated the same as other employees who committed similar overspeed violations and consistent with the IDPAP.

For all of these reasons, and as set forth in more detail below, CSX respectfully requests that the Court dismiss Watts' complaint and enter summary judgment in CSX's favor.

## I.    STATEMENT OF FACTS

### A.    CSX's Operations and Watts' Employment

CSX is the largest Class I railroad in the eastern United States, operating in 26 states and the District of Columbia. As such, it is subject to the FRSA. CSX's operational goal is to get customers' goods from place to place when the company promised and to do so safely and efficiently. CSX has established Operating Rules to ensure that its operations comply with federal law and are safe for both employees and the communities in which it operates. CSX expects its employees to follow the Operating Rules because a failure to do so can potentially have catastrophic and tragic consequences. Ex. A at 291:2-12; Ex. B at 17:8-16.

CSX hired Watts in August 1998. Ex. C. At all relevant times, she worked as a locomotive engineer based in Cleveland, Ohio. Ex. A at 22:16-21. A locomotive engineer is part of a train crew, along with a conductor. Ex. A at 21:2-3. Engineers are primarily responsible for operating the locomotive engine, including inspection of the locomotive before operation, and ensuring the safe movement of the train. Ex. A at 20:18-21:1; Ex. A at 296:12-20. The conductor is responsible

for the groundwork such as arranging rail cars and conducting brake tests. *Id.* As an engineer, the terms and conditions of Watts' employment were governed by a CBA between CSX and Watts' union. Ex. A at 25:19-20; 127:20-22.

### B.     Procedures for Lodging Safety Concerns

CSX requires its employees to report safety concerns, and strictly prohibits retaliation against employees who do so. Ex. A at 225:16-226:1, 291:2-4; Ex. D at CSXT0768-769. From the start, CSX teaches its engineers that the proper way to lodge a safety concern is by speaking directly with their manager – either face to face or by telephone. Ex. A at 226:5-7, 291:13-292:11, 297:19-23. Addressing safety concerns through other means, such as by faxing a safety form to a CSX terminal office, is less effective because there is no guarantee that the relevant manager will receive the concern and, thus, the unsafe condition could be left unresolved. *Id.* at 295:20-298:25. This instruction to raise concerns directly to one's manager is also in writing, in CSX's Code of Ethics Policy. *Id.* at 294:12-295:7, 299:5-300:12; Ex. D at CSXT00768-769.

### C.     CSX Disciplinary Policies and Procedures

The IDPAP (an acronym for Individual Development & Personal Accountability Policy) was CSX's disciplinary policy applicable to engineers like Watts during the relevant time. Ex. A at 254:15-18; Ex. F at CSXT0487-490. Under the IDPAP, offenses for which discipline may potentially be imposed were classified as non–major or major. Ex. A at 255:21-256:2; Ex. F at CSXT0489. A single speeding incident of less than 10 MPH over the speed limit during a three-year period was typically classified as non-major. Ex. A at 259:19-260:10; Ex. F at CSXT0487-490. However, when employees violated the same rule – including speeding – more than once during a three-year rolling period, those incidents were classified as major offenses. Ex. A at 256:24-257:3; Ex. F at CSXT0489. Employees could be dismissed for a single major offense (such

as repeat violations of the same operating rule), but discipline for non-major violations would generally result in a suspension, not termination. Ex. A at 256:3-23; Ex. F at CSXT0489-490.

The CBA between CSX and Watts' union sets out a detailed process that CSX must follow before it issues discipline against her, which includes time limitations. Ex. A at 254:2-14; Toni Eady Declaration ¶ 3. When a manager believes an employee may have violated CSX's Operating Rules, he enters an "assessment" into Field Administration's electronic system describing the circumstances of the employee's potential violation. Ex. A at 253:18-24. Field Administration, a group of employees located at CSX headquarters in Jacksonville, Florida, then reviews that assessment, the relevant Operating Rule, and the employee's history to determine whether a charge should be issued, and, if so, the classification of the misconduct. *Id.* at 254:20-255:2, 257:13-17, 260:23-6. Field Administration then notifies the employee that she is being charged with a potential rule violation and schedules an investigation hearing to determine whether the rule violation occurred. *Id.*[1] Discipline may only be issued if an employee is found to be at fault after a fair and impartial hearing conducted under the terms of the applicable CBA, or after the employee waives her right to a hearing and accepts responsibility for the charged offense. Ex. A at 254:5-14; Ex. F at CSXT0480-482, CSXT0489.

If the employee proceeds to an investigation, she has the right to be represented by a union official, and can give testimony, present documentary evidence, examine witnesses, and make statements on her own behalf. Ex. A at 80:13-91:9, 254:5-14; Ex. F at CSXT0482. The investigation hearing is presided over by an impartial CSX manager, known as a hearing officer, who does not make discipline decisions. Ex. A at 155:6-7; Ex. F at CSXT0480-482. Field

---

[1] When determining how to classify a particular charge, Field Administration has no information regarding whether an employee raised safety concerns or otherwise engaged in protected activity. Ex. A at 266:21-267:13. Moreover, in the overspeed context, Field Administration does not access information regarding the duration of the overspeed event. *Id.* at 260:10-13, 262:1-3.

Administration then sends the hearing transcript and exhibits to a higher level CSX manager not involved in the underlying incident or hearing, who decides whether the employee violated CSX's Operating Rules and, if so, the appropriate discipline to impose. Ex. A at 257:13-258:8.

>        **D.      ERAD System and Outdated Educational Memoranda**

The locomotive engines that CSX operates are equipped with event recorders which continually document various aspects of a locomotive's operation, including speed. Ex. B at 6:11-23. Certain portions of this data are monitored as part of CSX's ERAD[2] system. *Id.* The ERAD system communicates electronically with receivers at various points along the tracks, and notifies CSX's ERAD team in Jacksonville of any potentially unsafe events such as an overspeed. *Id.* The ERAD team reviews these communications and the underlying data and, when the data confirms an unsafe operating condition, forwards the data to local managers for review and follow up. *Id.*

CSX first implemented ERAD to capture speeding events on its locomotives in late 2007. *Id.* at 8:1-5; Ex. F at CSXT0484-486. Around that time, CSX issued educational memoranda to inform crews that ERAD would begin to monitor speed on the locomotives. Ex. B at 14:3-15:24; Ex. F at CSXT0484-486. The educational memoranda explained when and how discipline would be administered during the initial adjustment to the ERAD process. Ex. F at CSXT0484-486. During that initial transition period, discipline would be imposed only if the ERAD data showed a locomotive speeding for more than a minute. Ex. F at CSXT0484-486. However, by 2017-2018, the educational memoranda were no longer in effect. Ex. A at 226:16-227:19, 316:7-15; Ex. B at 14:13-19; 16:3-12. Instead, since at least 2012, CSX's policy on speeding has been clear: an overspeed of 5-9.99 MPH, for any amount of time (even for one second), is a violation of CSX's Operating Rules. Ex. A at 86:10-24, 227:8-19, 260:10-13, 316:7-15; Ex. F at CSXT0472-473.

---

[2] ERAD stands for Event Recorder Automated Download. Ex. A at 190:4-6.

### E.     Watts Reports that She Operated Her Train Over the Speed Limit

CSX's Operating Rule 300.2 prohibits speeding. Ex. F at CSXT0473. Doing so is significant misconduct – among other things, operating a train too quickly could cause a derailment, harm to the crew, and harm to communities. Ex. B at 17:8-16. Qualified engineers on CSX's territory are required to control their train at all times. Ex. A at 99:20-22.

On July 27, 2017, Watts self-reported a speeding incident to her manager at the time. *Id.* at 57:12-16, 76:20-22. Because Watts had no previous speeding violations within the last three years, Field Administration classified the offense as non-major and scheduled a formal hearing. *Id.* at 261:1-22; Ex. G at CSXT0004; Ex. H. Watts elected to waive the hearing,  admitted responsibility for the speeding violation, and accepted a formal reprimand. Ex. A at 77:15-78:7; Ex. H.

### F.     CSX'S ERAD System Catches Watts Speeding Again

On January 13, 2018, CSX's ERAD system detected Train D75413 traveling more than five MPH over the posted speed. Ex. I. Three days later, the ERAD team in Jacksonville notified Berghaus of the incident. Ex. A at 197:16-199:5; Ex. I. The e-mail from the ERAD team identified Watts and her conductor, J.E. Dembiec ("Dembiec"), as the train crew.  Ex. A at 199:2-13; Ex. I. Once Berghaus received the ERAD alert, he was required to respond and enter an assessment if the data showed the train was in fact speeding. Ex. A at 217:10-19. Unless the field manager can disprove the data documented in an ERAD alert, he is required to input an assessment into the Field Administration system. *Id.* at 214:19-24, 217:17-19, 221:22-222:2.

Berghaus verified the crew information and reviewed the data from the ERAD, which demonstrated that the D75413 had operated at 15.75 miles per hour for approximately 34 seconds along a section of track where the speed limit was 10 miles per hour.  Ex. A at 204:2-207:1, 210:17-211:7; Ex. F at CSXT0460-471. Thereafter, the data showed that the crew actively applied the "independent brakes" (*i.e.*, the locomotive's brakes), showing they realized that the train had been

speeding.  Ex. A at 207:20-208:18; Ex. F at CSXT0463. This data also suggested that the crew's speedometer was working properly. Ex. A at 209:1-7; Ex. F at CSXT0462-464.

Because Berghaus' review of the ERAD data substantiated that the crew exceeded the speed limit by over five MPH, Berghaus entered an assessment for both crew members for a potential violation of CSX's Operating Rule 300.2. Ex. A at 214:19-216:9; Ex. J.[3]

### G. Field Administration Classifies the Charges, CSX Holds and Investigation, and Dismisses Watts

Field Administration in Jacksonville then reviewed the assessments, and concluded that, under the IDPAP, charges should be issued.  Field Administration classified the charges as: (i) a potential non-major offense against Dembiec because he had no previous speeding violations within three years; but (ii) a potential major offense against Watts because it was her second speeding violation within three years. Ex. A at 217:24-218:3, 256:24-257:24; Ex. L at CSXT0489; Ex. G at CSXT0004.

Pursuant to the IDPAP and the CBAs with the applicable unions, CSX's Field Administration department in Jacksonville issued charge letters to both Watts and Dembiec, notifying them that CSX would hold an investigation hearing to determine whether they had operated their train over the authorized speed limit in violation of CSX's Operating Rules. Ex. A

---

[3] Berghaus took additional steps to substantiate the ERAD data. First, Berghaus connected his laptop computer to the locomotive's "black box" (*i.e.*, the physical event recorder on the locomotive that is used as part of the ERAD system) to download the data from the time of the incident and measured the locomotive's wheel. Ex. A at 200:21-201:25; 242:5-8. He saw that this download matched the ERAD data. *Id.* at 211:16-212:15; Ex. K. Further, because engineers are expected to document any issues in the locomotive's mechanics – which would include the speedometer (Ex. A at 202:2-8, 296:12-20, 326:4-8), Berghaus pulled and reviewed the locomotive work reports completed by Watts the day of and the day before the overspeed event. *Id.* at 212:16-214:18; Ex. K. Those locomotive work reports contained no reported issues, including for the speedometer. *Id.* As a result, Berghaus had "no doubt" that the train's speedometer was functioning properly at the time of the overspeed. *Id.*

at 81:10-13, 218:16-19; Ex. M. And consistent with the IDPAP, Watts was held out of service pending the investigation since she was charged with a major offense. Ex. A at 218:1; Ex. M; Ex. L at CSXT0489.

At the investigation hearing, Watts was represented by a union officer and was permitted to present testimony and evidence on her own behalf, as well as to cross-examine CSX's witnesses. Ex. A at 80:13-81:19. Watts testified that she did not believe she was speeding, and that the download must have been inaccurate. Ex. F at CSXT0453. Her union representative also entered two ERAD memoranda that were circulated to employees more than 10 years prior to her overspeed incident, when the ERAD speed monitoring system was first implemented, and claimed that speeding infractions of less than a minute did not warrant discipline. *Id.* at CSXT0440-0441.[4] Berghaus testified for CSX and explained that these memoranda were no longer in effect. *Id.* at CSXT0442. Berghaus also explained how the data from the ERAD demonstrated that Watts had been speeding, in violation of CSX rules. Ex. A at 219:2-9; Ex. F at CSXT0434-048, CSXT0460-0475. Apart from testifying during the investigation, Berghaus played no role in determining whether Watts violated CSX's Operating Rules and whether she should be disciplined. Ex. A at 219:5-9.

Consistent with CSX's discipline process, the discipline decision was made by Rosselli. Ex. A at 307:2-10, 311:12-14. In making that determination, Rosselli reviewed the investigation hearing transcript along with the relevant exhibits, including his own analysis of the ERAD. *Id.* at 311:5-313:21. Specifically, Rosselli determined that: (1) the locomotive reached a speed of 15.75 MPH; (2) the speed limit was 10 MPH; and (3) the duration of the overspeed did not matter. *Id.* at

---

[4] Notably, during the investigation, neither Watts nor her union representative claimed that the charge against her was in retaliation for raising safety concerns. Ex. A at 86:25-87:25.

312:10-316:3. In doing so, he gave the employees' evidence equal weight as CSX's evidence in order to provide a fair and impartial decision. *Id.* at 312:6-8. Rosselli concluded that Watts had committed the major rule violation with which she was charged and that she should be dismissed. *Id.* at 313:24-315:18; Ex. N at CSXT0002; Ex. O. Rosselli also found that Dembiec was culpable for the overspeed. Ex. A at 314:1-2. Pursuant to the IDPAP, Rosselli made the decision to suspend Dembiec for 15 days, because, unlike Watts, he did not have a previous overspeed violation within the last 3 years. Ex. A at 314:17-22. [5]

### H.  Alleged Protected Activity

Since at least 2009 when she became the vice president of her local union, Watts contends that she frequently raised alleged safety violations. Ex. A at 26:3-10, 29:3-10. Indeed, Watts claims that she would raise safety concerns as frequently as "every day depending on where [she] was working." *Id.* at 45:5-7. Watts says she completed approximately 40 forms between 2009 and 2016 describing alleged unsafe conditions, including complaints about lights being out, weeds that needed to be cut, and leaking toilets, among others. Ex. R at Watts000396-000464. According to Watts, those forms merely represent a subset of the concerns she raised. Ex. A at 37:4-10. In addition to submitting forms, Watts claims she would frequently call a representative from the Federal Railroad Administration with issues. *Id.* at 45:21-46:17; Ex. P. Watts produced her own hand typed document suggesting that she called the FRA at least 20 times in 2016 alone to raise alleged issues. Ex. P.

Here, Watts focuses on specific concerns she purportedly raised in the months leading up to her discipline for the January 13, 2018 overspeed event: (1) several forms she allegedly faxed

---

[5] As permitted by the CBA, Watts then arbitrated Rosselli's decision that she was speeding under her CBA. Ex. Z. On January 20, 2020, the Public Law Board concluded that Watts violated Operating Rule 300.2 by operating her locomotive over the authorized speed but reinstated Watts to her position with no payment for time lost, based solely on consideration of her seniority. *Id.*

to CSX's Collinwood terminal addressed to Berghaus in late 2017 related to allegedly dangerous holes in two separate work areas, and (2) two alleged reports (one, a phone call in December 2017; the other, an email on January 19, 2018) to the FRA claiming that Berghaus violated "hours of service" laws. Ex. A at 42:11-44:6, 47:25-52:11; Ex. P; Ex. Q at Watts00389; Ex. R at Watts000465- 468; Ex. S. Notably, however, the FRA has no record of a complaint made by Watts "in or about" December 2017 regarding Berghaus. Ex. T.

### I.     Comparator Discipline

CSX routinely disciplines employees for speeding:

- First, Dembiec was charged for speeding, and ultimately assessed a 15-day suspension for the same incident that led to Watts' termination. Ex. A at 263:2-264:21; Ex. U. The penalty the conductor received is consistent with the IDPAP's guidelines for non-major offenses because he had not committed a similar, recent speeding offense. Ex. A at 263:22-264:21; Ex. L.

- Next, CSX identified six other employees who were charged during the relevant time period with speeding violations between 5 and 9.99 MPH. Ex. A at 268:1-275:5; Ex. V at CSXT0710, CSXT0725, CSXT0735, CSXT0749, CSXT0753; Ex. W at CSXT0894. Four of the six employees received less severe discipline because they had not committed a recent speeding offense within the past three years. Ex. A at 271:8-275:7; Ex. V at CSXT0710, CSXT0725, CSXT0735, CSXT0749. However, two of the employees were also dismissed for violating the overspeed rule twice in a three-year period. Ex. A at 268:1-271:7; Ex. V at CSXT0753; Ex. W at CSXT0894.

- Third, CSX produced evidence demonstrating that three of the above-identified employees allowed their locomotive to exceed the authorized speed limit between 5 and 9.99 MPH *for less than a minute*. Ex. B at 8:11-10:8; Ex. V at CSXT0710-720 (employee allowed train to exceed speed limit by over 5 MPH for *seven seconds*); Ex. B at 10:9-22; Ex. V at CSXT0725-734 (employee allowed train to exceed speed limit by over 5 MPH for *six seconds*); Ex. B at 11:23-13:6; Ex. V at CSXT0735-748 (employee allowed train to exceed speed limit by over 5 MPH for *43 seconds*).

- Finally, in 2018, Berghaus assessed two other employees who allowed their locomotive to exceed the authorized speed between 5 and 9.99 MPH for less than a minute. Ex. A at 219:10-221:9; Ex. X (Berghaus entered assessment on another conductor and engineer who allowed their train to overspeed between 5 and 9.99 MPH for *16 seconds* in October 2018). Both employees were subsequently disciplined. *Id.*

### J. Procedural History

Watts filed a complaint with the Occupational Safety and Health Administration ("OSHA") alleging that her dismissal violated the FRSA. Ex. Y. Specifically, Watts contends that CSX dismissed her for reporting various unsafe working conditions and not because she operated her train above the authorized speed limit twice in under six months. *Id.* OSHA issued its final findings on April 14, 2020, determining that there was no reasonable cause to believe CSX violated the FRSA. Ex. AA. Watts objected to OSHA's findings and requested a hearing before an Administrative Law Judge on May 13, 2020. Ex. BB. After discovery and other pre–trial proceedings, the parties presented evidence on Watts' claims at a full two–day hearing in Cleveland, Ohio on November 15, 2022 and November 16, 2022, where Watts and seven other witnesses testified. On May 10, 2023, the ALJ agreed with OSHA and rejected Watts' claims after fully analyzing the merits. ECF 17-5, ALJ Order. This action followed.

## II. ARGUMENT

### A. The Court Should Grant Summary Judgment

Summary judgment is appropriate, where, as here, there is no genuine dispute of material fact, and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). To survive a motion for summary judgment, the non-moving party must "go beyond the pleadings and . . . designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Watts has not met her burden to prove retaliation under the FRSA. To do so, she must show that (1) she engaged in protected activity; (2) CSX knew or suspected that she engaged in protected activity; (3) she suffered an adverse action; and (4) her protected activity was a contributing factor in the adverse action. *See Consol. Rail Corp. v. Dep't of Labor*, 567 Fed. App'x. 334, 337 (6th Cir. 2014). Even if she makes this showing, summary

-13-

judgment is warranted if CSX demonstrates by clear and convincing evidence that it would have taken the same adverse action absent any protected activity. *See* 49 U.S.C. § 42121(b)(2)(B)(ii).

Watts' complaint fails on multiple levels. *First*, Watts cannot prove that the relevant CSX decisionmakers knew or suspected she engaged in protected activity. *Second*, Watts has not proven that any alleged protected activity was a contributing factor in CSX's decision to dismiss her. *Finally*, CSX has proven its affirmative defense that it would have disciplined Watts even if she had not engaged in any conduct that the FRSA protects. For each of these independent reasons, CSX is entitled to summary judgment.[6]

### B. Watts Cannot Establish a Prima Facie Case of FRSA Retaliation

#### 1. The Relevant CSX Managers Did Not Know that Watts Engaged in Alleged Protected Activity

To establish a retaliation claim under the FRSA, the plaintiff must show that the relevant final decision maker was aware of her protected activity. *Mangold v. Norfolk S. Ry. Co.*, 2021 WL 5904091, at *5 (6th Cir. Dec. 14, 2021); *Hand v. CSX Transportation, Inc.*, 2021 WL 963584, at *8 (N.D. Ohio Mar. 15, 2021). It is not enough to establish that *someone* at the company was aware of the protected activity. *Mangold*, 2021 WL 5904091, at *5 (holding plaintiff's conclusory allegations that his reports were commonly known was not enough to establish requisite knowledge); *Kuduk v. BNSF Ry. Co.*, 768 F.3d 786, 791 (8th Cir. 2014) (finding plaintiff failed to establish knowledge requirement where he presented no evidence that the lower-level supervisor advised the decision-makers of plaintiff's report).

Watts cannot show that the relevant CSX managers knew of her alleged protected activity. Watts claims she engaged in protected activity by (1) allegedly faxing several forms to CSX's

---

[6] CSX does not contest that her dismissal constitutes an adverse employment action and assumes, for purposes of summary judgment only, that Watts engaged in at least some protected activity during her employment with CSX.

Collinwood terminal addressed to Berghaus in late 2017, and (2) reporting Berghaus to the FRA (via phone in December 2017 and by email on January 19, 2018) for an alleged hours of service violation. Ex. A at 42:11-44:6, 47:25-48:21; Ex. P, Ex. R at Watts000465- 468; Ex. S.[7]

**First**, as to the forms, although Watts faxed several forms in years past that were not addressed to Berghaus (Ex. A at 96:17-97:1), she cannot show that her 2017 forms addressed to Berghaus were ever sent. *Id.* at 97:2-5. Even if they were, Watts does not know whether anyone, including Berghaus, ever received a copy of these forms. *Id.* at 95:21-96:1. Berghaus testified that he never received the 2017 forms at issue. *Id.* at 245:23-246:11. Further, while Watts claims she addressed concerns with Berghaus in person in years past (*id.* at 29:11-30:20), she did not speak with Berghaus about her 2017 reports. *Id.* at 96:5-11. Although one of Watts' 2017 forms mentioned an issue with the terrain at the Duraline site (*id.* at 222:6-11), Berghaus became generally aware of that issue through inspecting the area himself. *Id.* at 222:12-13.[8]

**Second**, with respect to her alleged reports to the FRA, Watts claims that she called the FRA on December 17, 2017, regarding Berghaus allegedly violating hours of service laws on November 30, 2017. Ex. A at 93:16-19. Other than entries in her personal notes, there is no evidence that this call ever occurred. Ex. P; Ex. Q at Watts000390. Indeed, in response to a FOIA request made by Watts' counsel in this matter, the FRA stated it has no record of any contact from Watts "in or about December 2017." Ex. T. Not surprisingly, Berghaus has no knowledge regarding Watts' alleged FRA report. Ex. A at 223:18-24.

---

[7] Watts also claims she made a complaint to CSX's ethics helpline. Ex. A at 52:12-53:2, 100:17-20. However, this complaint is irrelevant to this matter, as it occurred after Watts was told that her locomotive triggered the ERAD overspeed alert on January 13, 2018, and that she would be subject to the IDPAP disciplinary process. *Id.* at 100:17-101:3. Even if Berghaus had knowledge, neither Field Administration nor Rosselli had knowledge of any complaints lodged by Watts, including the helpline complaint. *Id.* at 317:9-21.

[8] Berghaus had also heard of the Duraline issue from employees, but could not recall if Watts or someone else raised the issue with him. *See* Ex. A at 222:12-13, 246:12-16.

In any event, Berghaus's knowledge is of no import because ERAD – not Berghaus – discovered Watts' overspeed. Berghaus was required to input an assessment if the ERAD data substantiated an overspeed, and he could not exercise discretion not to do so. Ex. A at 215:4-8. The mere acts of submitting an assessment and providing evidence at the subsequent investigation hearing do not make Berghaus a decisionmaker as to Watts' discipline. *Hand*, 2021 WL 963584, at *8. In *Hand*, the court concluded that the decision to *assess* an employee is separate and apart from the relevant decision – the decision to *discipline* an employee. *Id.* Thus, even if a manager who input an assessment and testified at the plaintiff's investigation hearing had knowledge of protected activity, that knowledge was not related to the discipline decision made by another manager. *Id*.

Here too, the individuals with the discretion to issue a charge letter, classify the misconduct, and discipline Watts unquestionably did not have any knowledge of any alleged protected activity by Watts. Field Administration – not Berghaus – issued the charge letter and classified that charge against Watts as a major. Ex. A at 217:24-218:3; Ex. L at CSXT0489, Ex. G at CSXT0004. Field Administration has no insight into any alleged safety complaints made by any employee, including Watts. Ex. A at 266:21-267:6. Similarly, Rosselli – not Berghaus – made the decision to terminate Watts' employment. Ex. A at 307:2-10, 311:12-14. Rosselli did not know Watts (*id.* at 311:12-16), nor did he know anything about her alleged protected activity at the time he made the discipline decision. *Id.* at 317:9-21. Rosselli did not consult with anyone, including Berghaus, when deciding whether to discipline Watts and Dembiec. *Id.* at 319:14-320:19. Instead, Rosselli made an independent decision based solely on his review of the hearing transcript and exhibits, including his own review of the ERAD data. *Id.* at 310:1-9, 311:1-312:11, 313:11-314:4, 319:25-320:19. And, during the investigation hearing, neither Watts nor her union representative

brought up her safety complaints, making it impossible for Rosselli to have known about Watts' alleged protected activity. *Id.* at 86:25-87:25. Simply put, the relevant decisionmaker as to Watts' discipline had no knowledge of any purported safety complaints by Watts.

### C. Watts Cannot Prove That Her Dismissal Was Retaliatory

FRSA plaintiffs must prove that protected activity was a contributing factor in their dismissal. *See* 49 U.S.C. § 20109(d)(2)(A)(i); 29 C.F.R. § 1982.109(a); *see also Lemon v. Norfolk So. Ry. Co.*, 958 F.3d 417, 419 (6th Cir. 2020). "The contributing factor standard has been understood to mean 'any factor which alone or in connection with other factors, tends to affect in any way the outcome of the decision.'" *Mangold,* 2021 WL 5904091 at *5. FRSA plaintiffs can prove that their protected activities contributed to an adverse action by pointing to circumstantial evidence, such as temporal proximity, the relation of the protected activity to the discipline, the lack of intervening events that independently merit discipline, or indications of pretext such as the inconsistent application of workplace policies. *See, e.g.*, *Hand*, 2021 WL 963584, at *7; *Gunderson v. BNSF Ry. Co.*, 850 F. 3d 962 (8th Cir. 2017).

To prevail, Watts must thus tie her alleged protected activity to her dismissal. *Ryan v. CSX Transportation, Inc.*, 2019 WL 3254129, at *5 (S.D. Ohio July 19, 2019); *see also Koziara v. BNSF Ry. Co.*, 840 F.3d 873, 878 (7th Cir. 2016) ("The Federal Railroad Safety Act does not punish railroads for disciplining (including firing) employees unless the discipline is retaliatory."). The undisputed facts confirm that Watts' dismissal had nothing to do with her alleged protected conduct. Rather, CSX dismissed Watts because CSX's ERAD system caught her locomotive speeding. CSX followed its standard disciplinary process in determining her responsibility for the overspeed – affording her a fair and impartial hearing with union representation and the ability to present evidence and cross-examine witnesses. At no time during that hearing did Watts or her representative ever claim that she was being retaliated against for reporting safety concerns. And

importantly, Watts has not and cannot present any evidence that the manager who decided to dismiss her – Rosselli – did not believe that she had violated CSX Operating Rules against speeding.

### 1. Watts Cannot Rely on Timing to Prove Her Claim

As noted above, Watts cannot prove that the relevant CSX managers had any knowledge of her alleged protected conduct in late 2017 sufficient to establish temporal proximity. *See* Section II.B.1. But even if this were not so, temporal proximity alone is insufficient to meet a plaintiff's burden to prove contributing factor. *See Heim v. BNSF Ry. Co.*, 849 F.3d 723, 727 (8th Cir. 2017) (rejecting the notion that 'temporal proximity, without more, is sufficient to establish a prima facie case' under the FRSA." (quoting *Kuduk*, 768 F.3d at 792)). This is particularly true where the alleged protected activity and the adverse employment action are separated by an intervening event — such as an employee's rule violation — that could have independently caused the action. *See Mangold v. Norfolk S. Ry. Co.*, 2020 WL 7334679, at *9 (N.D. Ohio Dec. 14, 2020), *aff'd*, 2021 WL 5904091 (6th Cir. Dec. 14, 2021); *Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 472 (6th Cir. 2012) (finding "an intervening legitimate reason to discipline" the plaintiff "extinguishes any inference [of retaliation] based on temporal proximity."). To hold otherwise would immunize employees like Watts from the consequences of their misconduct, which courts have repeatedly held is not the purpose of the whistleblower statutes. *E.g.*, *Lemon*, 958 F. 3d at 420-21; *BNSF Ry. Co. v. U.S. Dep't of Labor*, 816 F.3d 628, 639 (10th Cir. 2016).

The Sixth Circuit has repeatedly held that short intervals between protected activity and an adverse employment action are not sufficient to prove causation. *See, e.g.*, *Kenney v. Aspen Technologies, Inc.*, 965 F.3d 443, 449 (6th Cir. 2020) ("[A] roughly 75-day delay between her protected activity and an adverse employment action is not, standing alone, a convincing case for proving causation."); *Imwallwe v. Reliance Med. Prods.*, 515 F.3d 531, 550 (6th Cir. 2008) ("In

this circuit, a period of more than four months was found to be too long to support an inference of causation."). Moreover, Watts' "long history" of "complaints," "demonstrates [CSX's] willingness to retain employees who engage in protected activity, not a propensity to retaliate against them." *Mittman v. City of Toledo,* 156 F.3d 1231 (6th Cir. 1998); *see also Reid v. Neighborhood Assistance Corp. of Am.*, 749 F.3d 581, 591 (7th Cir. 2014) ("not reasonable" to infer retaliatory intent where only two weeks elapsed between protected complaints and discharge because plaintiffs had been making similar complaints "for some time" without repercussions); *Dafoe v. BNS Ry. Co.*, 164 F. Supp. 3d 1101, 1115 (D. Minn. 2016) ("the fact that [plaintiff] made numerous safety complaints . . . over a period of [ ] years without [the railroad] taking any adverse action against him belies his [FRSA retaliation] claim").

Although Watts testified that she began raising safety concerns in 2009, sometimes on a daily basis (Ex. A at 26:3-10, 29:3-10, 45:5-7), much of Watts' activity occurred in 2015 and 2016. Indeed, Watts' most active period for submitting complaint forms occurred between May and November of 2015. Ex. R at Watts00424-Watts000457. And, Watts created her own notes suggesting that she called the FRA at least 20 times from January to June of 2016 with alleged safety issues. Ex. P.[9] Despite this period of alleged frequent complaints, Watts was not terminated until almost two years later. Ex. G. And the event triggering her dismissal in February 2018 was that CSX's ERAD system caught her speeding on January 13, 2018 for the second time in a period of six months. *Id.* Under these facts, there is no basis to infer retaliatory intent based on timing.

---

[9] Watts has no credible argument that these earlier complaints contributed to her dismissal, as the lengthy temporal gap undermines any causal connection that could otherwise be inferred between the events. *See Kenney*, 965 F.3d at 449 (75-day difference between protected activity and an adverse employment action does not prove causation); *Imwalle*, 515 F.3d at 550 (same for four months).

*See e.g. Mangold*, 2020 WL 7334679, at *9 (reliance on temporal proximity is undermined by the fact that the alleged protected activity "was entirely unrelated to the intervening acts associated with the discipline.")

### 2. Watts' Intervening Operating Rules Violation Destroys Any Inference of Contributing Factor

Even if there had been close timing between Watts' alleged protected conduct and her dismissal, it still would not be enough for Watts to survive summary judgment. It is axiomatic that engaging in protected activity does not immunize an employee from legitimate discipline. *See, e.g., Lemon*, 958 F. 3d at 420-21 (FRSA-protected conduct does not immunize employees from discipline for wrongdoing); BNSF *Ry. Co.*, 816 F.3d at 639 (same). Summary judgment is warranted where an employee's actions "were 'intervening event[s] that *independently* justified adverse disciplinary action." *Mangold*, 2021 WL 5904091, at *5. The ERAD-detected overspeed constitutes an intervening event justifying Watts' dismissal.

As an initial matter, it is undisputed that Watts self-reported a speeding violation in July 2017, accepted a waiver, and admitted violating Rule 300.2 by exceeding the speed limit by 5-9.99 MPH. Ex. A at 77:15-78:7; Ex. G at CSXT0004. Less than six months later, CSX's electronic monitoring ERAD system detected an overspeed event on January 13, 2018. Ex. A at 197:16-199:5; Ex. I. CSX's ERAD department in Jacksonville conducted an initial review of the overspeed event, identified Watts and Dembiec as the crew, and sent the ERAD data to Berghaus. Ex. A at 190:4-191:18. Berghaus, a manager with significant experience handling ERAD alerts (*id.* at 193:8-20), followed the same process he routinely used in reviewing ERAD overspeed notifications (*id.* at 191:19-192:11; 197:16-199:5), and confirmed that the ERAD alert data was consistent with an overspeed. *Id.* at 204:2-207:1, 210:17-211:7; Ex. F at CSXT0460-471. Berghaus found that once the locomotive reached its maximum speed of 15.75 MPH, the independent brake

was applied, indicating that the crew realized they allowed the train to exceed the speed limit and that the crew's speedometer was working properly. Ex. A at 207:20-20:7; Ex. F at CSXT0462-464.

As he was required to do, Berghaus entered assessments on both Watts and Dembiec for the overspeed of 5-9.99 MPH. Ex. A at 214:19-216:9; Ex. J. Field Administration in Jacksonville then reviewed the assessments, and concluded that, under CSX's IDPAP, charges should be issued and classified the charges against Dembiec as a non-major offense, but as a major offense against Watts because it was her second speeding violation within three years. Ex. A at 256:24-257: Ex. L. In accordance with CSX's disciplinary policy, CSX removed Watts from service pending an investigation hearing. Ex. A at 218:20-219:1; Ex. M; Ex. L at CSXT0489.

At the investigation hearing conducted pursuant to the IDPAP and Watts' CBA, Watts was represented by a union officer and was permitted to present testimony and evidence on her own behalf, as well as to cross-examine CSX's witnesses. Ex. A at 80:13-81:19. During the investigation hearing, neither Watts nor her union representative claimed that the speeding charge was in retaliation for raising safety concerns. *Id.* at 86:25-87:25. Rosselli then independently reviewed the January 24, 2018 investigation hearing transcript and all supporting evidence, which included reviewing the ERAD data. *Id.* at 311:1-25, 313:11-21; Ex. F at CSXT 0423-0490. Based on his impartial review, Rosselli concluded that both employees violated CSX's Rule 300.2 which prohibited speeding and that both employees should be disciplined to the maximum extent available under CSX's disciplinary policy. Ex. A at 312:9-17, 313:24-315:18; Ex. N at CSXT0002. Notably, Rosselli was not involved in the investigation hearing of Watts and Dembiec, he did not know either employee, and he did not speak to anyone in the course of his review, including Berghaus. Ex. A at 311:12-16, 317:9-21, 319:14-320:19. Thus, the evidence demonstrates that

Watts' speeding on January 13, 2018 was an intervening rule violation negating any inference of retaliation.

### 3. Watts Cannot Show That the Manager Who Dismissed Her Did Not Honestly Believe That She Violated CSX's Operating Rules By Speeding

Watts claims that she was not speeding on January 13, 2018, and that, even if she were, the speeding lasted for less than a minute so she should not be subject to discipline.[10] Ex. A at 65:22-66:5, 86:2-6. But, the critical inquiry "is not whether the employee actually engaged in the conduct for which [s]he was terminated, but whether the employer in good faith believed that the employee was guilty of the conduct justifying [the discharge]." *Hand*, 2021 WL 963584, at *8; *see also Mangold*, 2021 WL 5904091 at *5 ("courts do not act as a 'super-personnel department' and re-examine an employer's disciplinary decisions"); *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 598 (6th Cir. 2007) (plaintiff's "disagreement with the facts" informing the basis for discipline "does not create a genuine issue" where "an employer has an honest belief in its proffered non[retaliatory] reason."); *Gunderson*, 850 F. 3d at 969 ("[i]f the discipline was wholly unrelated to protected activity, . . . whether it was fairly imposed is not relevant to the FRSA causal analysis"). Even if there might be a material dispute as to whether an employee violated an employer's rules, summary judgment remains appropriate where evidence exists from which the final decision maker could conclude that she had. *Mangold*, 2021 WL 5904091 at *5.

---

[10] Watts claimed at the investigation hearing, as well as during the subsequent arbitration of her dismissal, that two outdated educational memoranda, circulated to employees ten years prior to her overspeed event when the ERAD speed monitoring system was first implemented, prevented discipline for her ERAD-detected overspeed. Ex. A at 69:1-10; 151:15-19; Ex. B at 8:1-5; Ex. F at CSXT0484-486. But these documents were not in effect during the relevant time period and, in fact, were pulled from the "engineer reading room" approximately 5 years prior to her dismissal. Ex. A at 226:16-227:19, 316:11-15; Ex. B at 14:13-19; 16:3-17:7. Indeed, since at least 2012, CSX's policy on speeding has been clear: an overspeed of 5-9.99 MPH, for any amount of time (even for one second), is a rules violation. Ex. A at 86:10-24, 227:8-19, 260:10-13, 315:19-316:3; Ex. F at CSXT0472-473. The duration of the speed event does not matter because "there was no time period on [the overspeed rule]." Ex. A at 315-316:3.

The evidence demonstrated that Rosselli honestly believed that Watts violated CSX's Operating Rules by speeding. To reach that conclusion, Rosselli reviewed the investigation hearing transcript along with the relevant exhibits, including his own analysis of the ERAD, and determined that: (1) the locomotive reached a speed of 15.75 MPH; (2) the speed limit was 10 MPH; and (3) the duration of the overspeed did not matter. Ex. A at 311:5-316:3. In doing so, he gave Watts' and Dembiec's evidence equal weight as CSX's evidence in order to provide a fair and impartial decision. *Id.* at 312:6-8. Because Rosselli concluded, based on the evidence, that Watts had been speeding for the second time in six months, he then decided that she should be dismissed.[11] *Id.* at 313:24-315:14, 315:8-18; Ex. N at CSXT0002, Ex. O.[12]

Watts has presented no evidence to the contrary as to Rosselli's honestly held belief that she was speeding. *See Wright v. Murray Guard*, 455 F.3d 702, 709 (6th Cir. 2006) (affirming summary judgment where plaintiff offered no evidence to counter defendants' "honestly held belief in" its legitimate reason for discipline "supported by particularized facts after a reasonably thorough investigation); *Hand*, 2021 WL 963584, at * 8 (granting summary judgment where plaintiff presented no evidence that manager who decided discipline did not honestly believe plaintiff had violated defendant's rules).

---

[11] Rosselli also found that Dembiec was culpable for the overspeed. Ex. A at 314:1-2. Pursuant to the IDPAP, Rosselli made the decision to suspend Dembiec for 15 days, because, unlike Watts, he did not have a previous overspeed violation within the last 3 years. *Id.* at 314:17-22.

[12] Further, a neutral arbitrator, well-versed in the railroad industry, affirmed Rosselli's belief that Watts had been speeding, finding "there is nothing in the record to throw any doubt on the accuracy of the ERAD download, which . . . showed that the authorized speed . . . was exceeded by more than 5 mph." Ex. Z. Similarly, Watts' claims were again reviewed during a two-day hearing before an ALJ who concluded "the exhibits reviewed by Rosselli prior to firing Watts objectively and subjectively informed Rosselli that Watts' train was speeding on January 13, 2018" (ECF 17-5, ALJ Order at 15) and that Watts "failed to prove . . . that her participation in protected activity contributed in any way to CSXT's decision to take disciplinary action against her." *Id.* at 19.

### 4. Watts' Discipline Complied With CSX Policy and Was Consistent With Discipline Imposed on Similarly-Situated Employees

"[A] railroad has the right, absent a retaliatory or other unlawful motive, to enforce its rules rigorously." *James v. Norfolk S. Ry. Co.*, 2024 WL 1242311, at *12 (N.D. Ohio Mar. 22, 2024). The charge brought against Watts, the investigation hearing process and the discipline imposed unquestionably complied with CSX procedures and policy. Watts violated CSX Operating Rule 300.2 twice in a six-month period. Ex. G; Ex. F at CSXT0473. Pursuant to CSX's IDPAP, major offenses—which include violating the same operating rule twice in a three-year period—are grounds for dismissal. Ex. A at 315:8-18; Ex. L; Ex. O. Rosselli, the CSX manager who made the decision to terminate Watts' employment, had a standard practice of providing the maximum discipline allowed under the IDPAP, and treated both Watts and Dembiec accordingly. Ex. A at 307:2-10, 328:9-13. Further, as discussed in detail below, CSX routinely issues the same discipline to individuals who engage in the very misconduct that Rosselli reasonably believed Watts was guilty of here. *See* Section II.C.

### 5. Watts Has Not Proven Antagonism or Hostility Towards Her Protected Activity

An employer's motive for disciplining an employee may also be relevant to determining whether the discipline is retaliatory, and animus towards protected activity can therefore support causation. *See Lemon*, 958 F.3d at 419 ("[E]ven if Lemon provided concrete, admissible evidence of a policy of pretextual retaliation, that would not alter the reality that Lemon hasn't shown the railroad retaliated against him."); *Koziara*, 840 F.3d at 878 (dismissing FRSA claim where evidence did not establish that plaintiff's discipline "w[as] motivated by animus"). Here, there is no evidence of retaliatory animus by any CSX manager. Watts presented testimony regarding her perception of managers' treatment towards her years ago – all of which was vague, inconsistent, and wholly irrelevant to the discipline decision at issue in this matter. Ex. A at 53:10-56:24

Importantly, none of that testimony made allegations of such animus by Field Administration or Rosselli. *Id.*

Contrary to Watts' theory, CSX encourages employees to report safety concerns and, in fact, the rules require it. *Id.* at 225:16-226:1, 291:2-4; Ex. D at CSXT0768-769. Consistent with this focus on safety, engineers are taught that the proper way to lodge a safety concern is by speaking directly with their manager so that the issue can be fixed as soon as possible. Ex. A at 226:5-7, 291:13-292:11. This instruction to lodge concerns with one's manager is further enforced through CSX's Code of Ethics Policy. *Id.* at 294:12-295:7; Ex. D at CSXT0768-769. Once an employee lodges a safety concern with his or her manager, the manager is expected to find a solution to the unsafe condition as soon as possible so that it can be fixed before the next employee encounters the same hazard. Ex. A at 292:12-18. In fact, Berghaus testified that he expected employees to bring safety issues to his attention. *Id.* at 225:17-226:7.

**6.      There are No Other Indicia that Watts' Alleged Protected Activity Was a Contributing Factor in Her Dismissal**

CSX has established that it: (i) reasonably concluded Watts violated CSX's Operating Rules by speeding; (ii) has consistently explained that it disciplined Watts for misconduct; (iii) has proven that its treatment of Watts was consistent with its written rules and policies; and (iv) has shown that it encouraged reports of safety concerns. Thus, there is simply no evidence that Watts' alleged protected activity was a contributing factor to her dismissal from employment. Instead, Watts was dismissed because, and only because, she operated her locomotive above the applicable speed restriction twice in six months. *See, e.g.*, *Mangold*, 2020 WL7334679, at * 9 ("Mangold has presented no evidence showing that his alleged protected activities were contributing factors in his discipline and discharge. His reliance on conjecture and speculation that he was targeted for protected activity that he consistently engaged in throughout his entire railroad career is

insufficient . . . to satisfy his initial burden of demonstrating the existence of a prima face case of retaliation.").

Here, the evidence undisputedly demonstrates that Watts' discipline was issued for legitimate, non-retaliatory reasons because: (i) it was unrelated to any alleged protected activity; (ii) it followed the IDPAP and CBA procedures (including a fair and impartial investigation hearing); (iii) it was based on a fair and impartial review of the hearing evidence by the discipline decisionmaker (Rosselli) who honestly believed an overspeed in violation of CSX's Operating Rules occurred; and (iv) Rosselli was unaware of any alleged protected activity and did not consult anyone, including Berghaus, in his dismissal decision. Watts cannot show that these reasons were a pretext for retaliation. In short, none of the evidence demonstrates that Watts' alleged protected activity was a contributing factor in her dismissal for her second speeding event in six months.

> **D.  Even If Watts Could Establish a Prima Facie Case, CSX Has Proved By Clear And Convincing Evidence That It Would Have Disciplined Her Notwithstanding Her Alleged Protected Activity**

Even if Watts had proven that her FRSA-protected activity contributed to her dismissal—which she did not—CSX is not liable if it demonstrates by clear and convincing evidence that it would have taken the same unfavorable personnel action in the absence of the protected activity. 49 U.S.C. § 42121(b)(B)(iv). In analyzing the "same action" defense, courts consider, among other factors, whether there is temporal proximity between the employee's rule violation and discipline, whether managers who lacked knowledge of the protected conduct signed off on the discipline, and whether the discipline was consistent with discipline assessed to similarly-situated employees. *See, e.g.*, *Kuduk*, 768 F.3d at 792-93 (granting summary judgment on affirmative defense); *Mangold*, 2020 WL 7334679, at *25-27 (same); *Lee v. Norfolk S. Ry. Co.*, 187 F. Supp. 3d 623, 636-37 (W.D.N.C. 2016) (same); *see also Johnson v. Stein Mart, Inc.*, 440 F. App'x 795, 801-04 (11th Cir. 2011) (same). All of these factors favor CSX.

*First*, there is close temporal proximity between CSX's discovery of Watts' second speeding violation and its decision to discipline her. Watts allowed her locomotive to exceed the authorized speed on January 13, 2018. Ex. I. CSX's ERAD system notified the ERAD group in Jacksonville of the overspeed event three days later, who in turn, notified Berghaus. *Id.* Thereafter, Watts' CBA imposed strict time limits dictating when an assessment and charge letter had to be entered, when the investigation had to be conducted, and when discipline must be issued.[13] Ex. A at 203:5-8; 254:2-14. Eady Dec. ¶ 4. Here, CSX acted in compliance with those time limitations – resulting in Watts' termination on February 23, 2018 – approximately five weeks after CSX first learned of the overspeed through ERAD. Ex. I; Ex. O.

*Second*, as set forth in detail above, Watts failed to present evidence that any relevant decisionmaker was aware of her alleged protected activity. *See* Section II.A. Even if Berghaus were deemed to have knowledge, which CSX disputes, he did not decide to discipline Watts. *Mangold*, 2021 WL 59004091, at *5 (even if charging managers had knowledge of plaintiff's protected activity, FRSA plaintiff must still show that the final decision maker was influenced by the protected activity); *Hand*, 2021 WL 963584, at * 8 (holding that manager who inputs assessment and testifies at investigation hearing was not discipline decisionmaker). Neither did Field Administration, which issued and classified the charge against Watts as a major (Ex. A at 261:21-22; 266:21-267:13), nor Rosselli, who made the decision to terminate her, had any knowledge of alleged protected activity by Watts. Ex. A at 317:9-21. Indeed, Rosselli based his decision to terminate by conducting an independent analysis of the on-property hearing transcript and exhibits, including review of the ERAD data, without speaking with any individuals involved,

---

[13] Failure to meet the CBA time limitations at any step of the process means that CSX may not discipline the employee for any alleged Operating Rules violation. Eady Dec. ¶ 7.

including Berghaus. *Id.* at 313:11-21, 319:14-320:19. And during the investigation hearing, neither Watts nor her union representative brought up her safety complaints, making it impossible for Rosselli to have known about Watts' alleged protected activity. *Id.* at 86:25-87:25. *See Mangold*, 2020 WL 7334679, at *25-27 (granting summary judgment where plaintiff failed to present any evidence that the final decisionmakers "were influenced by [plaintiff's] protected activity," in part because "[a]t no point in time was [plaintiff's] safety reporting raised during" his investigative hearing).

*Finally*, CSX's evidence shows it treated Watts consistently with other similarly situated employees disciplined for both: (i) operating their locomotive between 5 and 9.99 MPH over the authorized speed limit for less than a minute; and (ii) violating the overspeed rule twice in three years. CSX identified six other employees who were disciplined during the relevant time period (2017-2018) for speeding violations between 5 and 9.99 MPH. Ex. A at 268:1-275:5; Ex. V at CSXT0710, CSXT0725, CSXT0735, CSXT0749, CSXT0753; EX. W at CSXT0894. Of these six:

- Four, like Dembiec, had not committed a speeding offense within the past three years. Ex. A at 271:8-275:7; Ex. V at CSXT0710, CSXT0725, CSXT0735, CSXT0749. These four were suspended, also like Dembiec.

- Two of the employees, like Watts, had violated the overspeed rule twice in a three-year period. Ex. A at 268:1-271:7; Ex. V at CSXT0753; Ex. W at CSXT0894. Both of these employees were dismissed – just like Watts.

- Three, like Watts and Dembiec, allowed their locomotive to exceed the authorized speed limit between 5 and 9.99 MPH *for less than a minute*. Ex. B at 8:11-10:8; Ex. V at CSXT0710-720 (employee exceeded speed limit by over 5 MPH for *seven seconds*); Ex. B at 10:9-22; Ex. V at CSXT0725-734 (employee exceeded speed limit by over 5 MPH for *six seconds*); Ex. B at 11:23-13:6; Ex. V at CSXT0735-748 (employee exceeded speed limit by over 5 MPH for *43 seconds*).

In addition to these six, in 2018, Berghaus personally input assessments for two other employees who, like Watts and her conductor, allowed their locomotive to exceed the authorized speed between 5 and 9.99 MPH for less than a minute. Ex. A at 219:10-221:9; Ex. X (conductor

-28-

and engineer allowed their train to overspeed between 5 and 9.99 MPH for **16 seconds** in October 2018). Both employees were subsequently disciplined. *Id*

Watts points to only one individual to claim that she should have been disciplined differently. This individual is not similarly-situated to Watts. Although it is correct that ERAD detected an overspeed involving that individual, he is not similarly-situated to Watts because the assessment for his overspeed was not entered in compliance with the time limits established by his governing CBA. Eady Dec. ¶ 8. Failure to comply with the CBA time limits in the IDPAP process prevents CSX from moving forward with the IDPAP process. *Id.* at ¶ 7. As a result, because this individual's assessment for the ERAD-detected overspeed was not timely submitted, Field Administration could not issue a charge letter (or determine whether any potential violation should be classified as major or non-major), an investigation hearing could not be conducted, and no discipline could be imposed. *Id.* at ¶ 8.

Simply put, the evidence demonstrated that Watts would have been terminated for the same conduct regardless of any alleged protected activity. As a result, Watts' FRSA claim must be dismissed.

## **CONCLUSION**

For the foregoing reasons, the Court should grant summary judgment to CSX.

Dated: June 7, 2024

/s/ Elaine Rogers Walsh
Elaine Rogers Walsh (*pro hac vice*)
Patrick M. Corley (*pro hac vice*)
JONES DAY
1221 Peachtree Street, N.E., Suite 400
Atlanta, GA  30361
Telephone:  404.581.3939
Facsimile:  404.581.8330
Email: erogerswalsh@jonesday.com
         pcorley@jonesday.com


Yaakov M. Roth (*pro hac vice*)
JONES DAY
51 Louisiana Avenue, NW
Washington, D.C.  20001
Telephone:  202.879.3939
Facsimile:  202.626.1700
Email:  yroth@jonesday.com

Elizabeth L. Dicus (No. 0081219)
JONES DAY
325 John H. McConnell Boulevard
Suite 600
Columbus, OH  43215
Telephone:  614.469.3939
Facsimile:  614.461.4198
Email:  eldicus@jonesday.com


Samuel V. Lioi (No. 100464)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone:  216.586.7135
Facsimile:  216.579.0212
Email:  slioi@jonesday.com

*Attorneys for*
*CSX Transportation, Inc.*

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Local Rule 7.1(f) CSX certifies that this matter has been assigned to a standard track. ECF No. 12. On December 19, 2023, CSX filed a Motion to Exceed Page Limitations, seeking leave to apply a 30-page limit to its Motion for Summary Judgment. ECF No. 25. The same day, the Court granted CSX's Motion to Exceed Page Limitations. CSX certifies that the instant memorandum complies with the Court's modifications. *See* December 19, 2023 Minute Entry.

## CERTIFICATE OF SERVICE

I hereby certify that on June 7, 2024, a copy of the foregoing document was filed electronically. Parties may access this filing through the Court's system. A courtesy copy was also emailed to all counsel per this Court's standing order. *See* Judge Nugent Standing Order, *Case Management Conference Order*.

*s/ Elaine Rogers Walsh*
*Attorney for Defendant*
*CSX Transportation, Inc.*