IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| DOROTHY GASIOROWSKI-WATTS,<br><br>   Plaintiff,<br><br>   v.<br><br>CSX TRANSPORTATION, INC.<br><br>   Defendant. | Civil Action No. 1:23-CV-1043<br><br>District Judge: Donald C. Nugent |

**CSX TRANSPORTATION, INC.'S MEMORANDUM IN SUPPORT OF ITS MOTION TO EXCLUDE OPINIONS AND TESTIMONY OF JAMES "JIMMY" C. SCOTT**

I.  **INTRODUCTION**

Plaintiff Dorothy Gasiorowski-Watts ("Watts") seeks to present the opinions and testimony of James C. Scott ("Scott") in support of her FRSA claims. Scott's purported opinions and testimony are not only irrelevant and unreliable, but he is unqualified on the topics. The thrust of Scott's opinions are that CSX did not calculate the speed of Watts' locomotive correctly. But, Watts' claim arises under the Federal Railroad Safety Act ("FRSA"); under FRSA, the relevant issue is not whether the speed of Watts' locomotive was calculated correctly, but whether the decisionmaker believed Watts was speeding. For all of these reasons, Scott's opinions and testimony should be excluded.

Scott, who last worked at CSX more than 30 years ago as a former Road Foreman of Engines, is a self-proclaimed expert in railroad operations. He seeks to offer testimony and opinions based on his work experience at CSX in the early 1990s, on topics ranging from event recorder download chain of custody forms, measured miles, and random event recorder download procedures in the 1990s, among others. First, Scott is not qualified to testify on CSX's event recorder automatic download ("ERAD")[1] procedures because during his tenure with CSX he never utilized automatic downloads, let alone ERADs now used to monitor speed. Nor has Scott received any specific training related to ERADs. Second, and as described above, Scott's opinions are not relevant – most fundamentally, because they have nothing to do with the only claim in this case – retaliation. But even beyond that, his opinions detour into matters that have no factual relationship to this case, such as rules and regulations related to accident and injury procedures that are inapplicable here. Third, Scott's opinions are not reliable. They are based on nothing more

---

[1] CSX's ERAD system communicates electronically with receivers at various points along the tracks, and notifies CSX's ERAD team in Jacksonville, Florida of any potentially unsafe events such as an overspeed. MSJ at 7.

sheer speculation. He reviewed only a handful of documents and did not review the most important document related to his report – the actual ERAD data that revealed Watts' speeding incident on January 13, 2018 that led the relevant decisionmaker to terminate her employment. He thus has no basis for his opinions, other than his own *ipse dixit*.

## II.     FACTUAL BACKGROUND

### A.     Brief Background Regarding Watts' Overspeed and Discipline

A full overview of the facts underlying Watt's overspeed incident and discipline can be found in CSX's Motion for Summary Judgment, filed on June 7, 2024. *See* Defendant's Memorandum in Support of its Motion for Summary Judgement, ECF 27-1 at 4-13 (hereinafter MSJ at __). CSX provides below a brief recitation of the most pertinent facts to the instant Motion.

On January 13, 2018, CSX's ERAD detected an overspeed event involving a locomotive operated by Watts and her conductor. MSJ at 8. CSX's ERAD team notified Trainmaster Michael Berghaus ("Berghaus") of the ERAD data. *Id.* Berghaus analyzed the ERAD data, confirmed that it substantiated an overspeed, and entered an assessment of a potential violation of CSX's Operating Rules into CSX's Field Administration System against both Watts and her conductor. *Id.* at 9.

Notably, in reviewing the ERAD data, Berghaus observed that when Watts' locomotive reached its maximum speed, the independent brake was applied, indicating that the crew realized they had allowed the train to exceed the speed limit and actively engaged the independent brake to slow the train back down. *Id*.

Berghaus took additional steps to substantiate the ERAD data, including by connecting his laptop computer to the locomotive's "black box" (*i.e.*, the physical event recorder on the locomotive that is used as part of the ERAD system) to download the data from the time of the incident, also known as a "hard download." As part of the hard download, Berghaus measured the

locomotive's wheel. *Id.* at 9 n.3. The data from the hard download matched the ERAD data. *Id.* Further, because engineers are expected to document any issues in the locomotive's mechanics – which would include the speedometer, Berghaus pulled and reviewed the locomotive work reports completed by Watts the day of and the day before the overspeed event. *Id.* Those locomotive work reports contained no reported issues, including for the speedometer. *Id.* As a result, Berghaus had "no doubt" that the train's speedometer was functioning properly at the time of the overspeed. *Id.*

CSX's Field Administration team in Jacksonville reviewed the assessments, and concluded that, under CSX's disciplinary policy then in effect (also called the "IDPAP"), charges of a potential violation of CSX's Operating Rules should be issued to both Watts and her conductor. *Id.* at 9. Further, Field Administration classified both charges under the terms of CSX's disciplinary policy. *Id.* As mandated by the employees' collective bargaining agreements ("CBA") with CSX, Watts and her conductor participated in an investigation hearing to determine whether they were responsible for the overspeed incident, during which they were each represented by a union officer, each permitted to present testimony and evidence on their own behalf, and each permitted to cross-examine CSX's witnesses. *Id.* at 10.

Following the investigation hearing, a higher level CSX manager not involved in the hearing who did not know Watts, Shaun Rosselli ("Rosselli"), made the decision as to whether CSX's Operating Rules on speeding were violated, and if so, the appropriate discipline. *Id.* at 10-11. In making those decisions, Rosselli independently reviewed the investigation hearing transcript along with the relevant exhibits – which included reviewing the ERAD data. Rosselli determined that: (1) the locomotive reached a speed of 15.75 MPH; (2) the speed limit was 10 MPH; and (3) the duration of the overspeed did not matter. *Id.* at 11. Because it was Watts' second

speeding violation within six months, Rosselli determined that her employment should be terminated and CSX dismissed her on February 23, 2018. *Id.*

**B.     James Scott**

From 1969 through 1977, Scott worked as a conductor and engineer for CSX (including predecessor railroad companies). Ex. A, Excerpts from Deposition of Jams Scott at 30:3-8 (hereinafter "Ex. A at __"). Scott worked in CSX management from 1977 to 1992, primarily as a Road Foreman of Engines, at which point he went out on leave. Ex. A at 30:9-32:20. While on leave, Scott brought a lawsuit against CSX and left the Company in 1995 as part of a settlement. Ex. A at 32:21-22; 94:12-95:9. Scott has not been employed by a railroad in any position since he last performed work for CSX in 1992. Ex. A at 28:1-4.

Watts served Scott's one-and-a-half page "expert report" on January 29, 2024. Ex. B, James Scott Expert Report (hereinafter "Ex. B at __"). According to his report, the only documents Scott reviewed before he prepared his report or sat for his deposition were: a few interrogatories and requests for production, the on-site investigation transcript of Watts in January 2018, the deposition transcript of Berghaus, a single CSX operating rule that he looked up online, and a one-page event recorder download. Ex. A at 51:20-52:16; 55:13-56:23; Ex. B at 2. Notably, Scott was under the false impression that the one-page event recorder download document that he reviewed in preparing his report was the ERAD download. Ex. A at 50:18-25, 96:21-23. It was not – it was a one-page screenshot of the hard download that Berghaus conducted which showed that the ERAD data matched the data from the locomotive event recorder – a fact Scott conceded when he was shown the actual ERAD download at issue during his deposition. Ex. A at 77:13-25, 96:21-23; Ex. C, Excerpts from November 15-16, 2022 Hearing Transcript Before ALJ at 201:8-202:21, 211:16-213:18, 242:5-8 (hereinafter "Ex. C at __"); Ex. D, Hard Download; Ex. E, ERAD Download.

-4-

Scott's report asserts two ultimate overarching opinions, which he claims to have made based on "a reasonable degree of professional certainty," including that: (1) the hard download that Scott reviewed is not a "standard download;" and (2) CSX did not provide an accurate measurement of speed of Watts' locomotive. Ex. B.[2] To support these "opinions," Scott breaks his report into three underlying sections. Ex. B.

**In the first section**, Scott opines that the relevant hard download which he claimed he had "not yet seen" should have been "accompanied by a chain of custody form." Ex. B. But, Scott admitted in his deposition that the chain of custody requirement, and the regulation he cited in support, only applied to cases in which an accident or injury has been reported, neither of which had occurred in Watts' speeding incident. Ex. A at 67:10-70:23. Next, Scott observed that the hard download screenshot states that the wheel size of the locomotive is 41 inches. Ex. B. Scott then speculates that the wheel measurement may be inaccurate because the relevant locomotive came new with a 40-inch wheel, and generally notes the importance of having the correct wheel size in order to accurately report speed. Ex. B. But, when deposed, Scott conceded that the locomotive "came new with a 40 inch tire" when it was first built in 1977, but also acknowledged the relevant locomotive had been subsequently rebuilt in 2017 – before the ERAD-detected speeding incident. Ex. A at 66:23-67:9. Scott initially admitted to having seen wheel sizes on similar locomotives measured at 41 ¼ to 41 ½ inches in diameter. Ex. A at 74:13-16.[3] Scott further admitted that he has no evidence to contest that the 41-inch wheel size reflected on the hard download in this matter was incorrect. Ex. A at 75:17-20; 76:3-13.

---

[2] When asked for the basis for this opinion, Scott replied simply "wheel size." Ex. A at 91:10-14.

[3] Later in his deposition, upon examination from Watts' counsel, Scott backtracked, stating the largest wheel he recalls seeing was 40 ½ inches in diameter. Ex. A at 105:16-106:11.

**In the second section**, Scott opines that "there is nothing in this case that I have read that would lead me to the conclusion that Watts was speeding." Ex. B. But, after reviewing the relevant ERAD download during his deposition – the document upon which Watts' and her conductor's discipline was based and which Scott did not review prior to sitting for his deposition – Scott admitted that the ERAD documented that Watts applied her independent brake once she began to go 5 MPH over the speed limit which "indicate[d] to [him] that she was trying to get her speed down." Ex. A at 78:15-22. In his report, Scott also attempted to bolster his conclusion that he saw nothing to indicate that Watts was speeding based on his misguided assumption that a speed test using a "measured mile" (*i.e.*, an exact mile measurement) must be conducted every time a locomotive is operated. Ex. A at 80:17-19.[4] Scott cannot point to any FRA requirement mandating that every segment of track must have a measured mile, (Ex. A at 80:25-81:6), and acknowledges that there are segments of track that do not have measured miles. Ex. A at 80:22-24; 82:1-16. In fact, he admits that engineers are not required to conduct such a test if there is no measured mile on the particular route that an engineer is operating on. Ex. A at 82:11-16.

Finally, **in the third section**, Scott states that when performing a hard download, the manager should input the proper wheel size. Ex. B. Again, Scott has no evidence to refute Berghaus' testimony that he took the wheel measurement when performing the hard download in this case, which measurement was shown on the screenshot. Ex. D. Scott further admitted that the hard download and the ERAD both show that Watts was speeding on January 13, 2018. Ex. A at 86:21-25, 90:21-25; Ex. C at 242:5-14.

---

[4] Although Scott cites 49 CFR 229.117 in support of this opinion, he also admits that engineers are not required to conduct such a test if there is no measured mile on the particular route that an engineer is operating on. Ex. A at 82:11-16.

**III. ARGUMENT**

Expert evidence "can be both powerful and quite misleading because of the difficulty in evaluating it." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993) (citation omitted). District courts therefore have a solemn gatekeeping function to exclude unreliable and irrelevant evidence under Rule 702. *See id.* at 597.

The Sixth Circuit has summarized Rule 702's "substantive test for admissibility" in three parts: "First, the witness must be qualified by knowledge, skill, experience, training, or education." *Superior Prod. P'ship v. Gordon Auto Body Parts Co.*, 784 F.3d 311, 323 (6th Cir. 2015) (cleaned up). "Second, the testimony must be relevant, meaning that it will assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.* And "[t]hird, the testimony must be reliable." *Id.*; *see also Daubert*, 509 U.S. at 588-89. The proponent of expert testimony "bears the burden of proving its admissibility," *EEOC v. Kaplan Higher Educ. Corp.*, 748 F.3d 749, 752 (6th Cir. 2014) (citation omitted), by a "preponderance of proof." *Pride v. BIC Corp.*, 218 F.3d 566, 578 (6th Cir. 2000).

**A. SCOTT'S OPINIONS SHOULD BE EXCLUDED ON MULTIPLE GROUNDS**

**1. <u>Scott Is Not Qualified.</u>**

Scott is not qualified to offer his opinions. To qualify as an expert under Rule 702, the witness must, among other things, "be qualified by 'knowledge, skill, experience, training, or education'" to opine on the specific question at issue. *Blount v. Stanley Eng'g Fastening*, 55 F.4th 504, 516 (6th Cir. 2022) (quoting *Bradley v. Ameristep, Inc.*, 800 F.3d 205, 208 (6th Cir. 2015)). In that inquiry, "[t]he trial court" must "decide whether" a "particular expert" has "sufficient specialized knowledge to assist the jurors 'in deciding the particular issues in the case.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999) (citation omitted). Thus, the "issue with regard

to expert testimony is not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994).

Here, Scott lacks any "knowledge, skill, experience, training, or education" relevant to the 2018 speeding incident in this case. Although difficult to discern due to the wandering nature of his report, Scott's opinions, at bottom, are opinions about the accuracy of a download related to the speeding incident on January 13, 2018 that led to Watts' dismissal – the hard download of Watts' locomotive which Scott mistakenly believed was the ERAD. Ex. B.

Setting aside the fact that Scott had not even reviewed the actual ERAD before preparing his report or sitting for his deposition (*see infra* at 13), Scott is not qualified to testify regarding ERADs because he simply has no personal experience with them. Indeed, at no point during his employment with CSX did Scott utilize any kind of ERAD or automatic download. Ex. A at 36:6-8. Nor did Scott ever utilize ERADs to monitor speed. Ex. A at 32:23-33:1. Instead, during Scott's employ with CSX as a Road Foreman from 1977-1992, he would review three "hard downloads"[5] per month in an effort to monitor speed. Ex. A at 33:12-34:25. And other than attending certain industry seminars throughout the years where ERADs may have been discussed, Scott has had no specific training on the general advances of ERAD and has received no training with respect to CSX's ERAD system specifically. Ex. A at 36:12-38:11.

Nor does Scott have relevant experience or qualifications with respect to his opinion that the 2017 hard download in this case should have been accompanied by a chain of custody form. Scott has not performed a download on a locomotive since 1992 at the latest. Ex. A at 28:1-4. Scott

---

[5] Unlike an ERAD, a hard download required a manager to personally obtain a locomotive's data. Ex. A at 38:23-39:11.

-8-

admits that he has not spoken to or reviewed any policies related to CSX's current practices with respect to hard downloads (or anything else). Ex. A at 55:12-18; 67:14-16; 81:10-18.

Although Scott may be "qualified as an expert" in some areas of train operations, the Court should "preclude[] him from offering opinions beyond th[ose] areas of expertise," including the modern ERAD download procedures which he seeks to testify about here. *Galoski v. Stanley Black & Decker, Inc.*, 2017 WL 2291431, at *2 (N.D. Ohio May 25, 2017) (J. Nugent).

## 2. Scott's Testimony is Irrelevant and Would Not Aid the Trier of Fact.

Scott's opinions are also not the proper subject of expert testimony. Pursuant to their "gatekeeping" obligation, trial courts must ensure, among other things, that expert testimony is relevant. *Daubert*, 509 U.S. at 589 n.7. "Expert testimony which does not relate to any issue in the case" lacks a proper "fit" and may therefore be excluded. *Id.* at 591. Every one of Scott's proposed opinions fails this relevance test.

Scott's opinions – which are merely speculative critiques into the veracity of the downloads at issue in this matter and the procedure by which they were obtained – are "simply not relevant to the question of whether Watts was subjected to unlawful" retaliation – the only issue in this case. *Pagan-Aponte v. McHugh*, 2011 WL 1789962, at *3 (M.D. Tenn. May 10, 2011), *aff'd*, 510 F. App'x 438 (6th Cir. 2013). Scott's attempt to challenge the accuracy of the downloads is misplaced because "an employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a [retaliatory] reason." *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 886 (6th Cir. 2020). And, here, Rosselli – the manager who decided Watts' discipline – independently reviewed the evidence presented during Watts' investigation hearing and determined that Watts and her conductor had both violated CSX's rule against speeding. *Hand v. CSX Transportation, Inc.*, 2021 WL 963584, at *8 (N.D. Ohio Mar. 15, 2021) (granting summary judgment where plaintiff presented no

evidence that manager who decided discipline did not honestly believe plaintiff had violated defendant's rules). Thus, even if Scott's speculative opinions were correct, *i.e.*, the underlying wheel measurement was somehow off (it was not) or proper protocols were not followed when obtaining the hard download (they were), Scott's testimony does nothing to challenge the fact that Rosselli, the discipline decision maker, had no knowledge of any of Watts' alleged protected activity and had an honestly held belief that Watts was speeding on January 13, 2018 based on his independent review of the evidence, including the ERAD data. *See* MSJ at 22.[6]

Beyond that fundamental issue, Scott's opinions detour into matters that have nothing to do with this case:

Chain of Custody. Scott contends that the hard download should have been accompanied by a chain of custody form. Ex. B. But Scott admits that the chain of custody requirement and the regulation he cites in support is only applicable to cases in which an accident or injury has been reported, and Scott admits that neither occurred as a result of the relevant speeding event in this case. Ex. A at 67:10-70:23.

Outdated Procedures. At the end of his report, Scott ventures far-afield into his personal experience with downloads in the early 1990s, including a claim that because he was allegedly the "only officer on the railroad that had a playback unit for event recorders . . . [i]f you had a download you wanted read, you sent it to me[.]" Ex. B. Scott admits the portion of his report related to the "infancy of event recorders" where he was allegedly "the only officer of the railroad with a playback unit" has nothing to do with ERADs. Ex. A at 91:15-21. Instead, this is a reference to a

---

[6] Nor do Scott's "opinions" rebut evidence that (1) CSX's ERAD system, which first detected speeding by the locomotive operated by Watts and her conductor, (2) Berghaus, who reviewed the ERAD data and confirmed it substantiated an overspeed, (3) Field Administration, which decided to issue a charge letter and classified Watt's overspeed as a major, also honestly believed that Watts was speeding on that date. *See* MSJ at 9-10, 22.

time where 8-track cassette recording devices were used to review hard downloads, a technology that Scotts admits has since progressed. Ex. A at 91:21-92:3.

None of this is relevant. And none of this will assist the jury in deciding a fact at issue in this case. Accordingly, Scott's opinions are irrelevant and should be excluded.

### 3. Scott's Testimony Is Not Reliable Under Daubert.

Experts may provide opinion testimony only if it is reliable. Where expert "testimony's factual basis, data, principles, methods, or their application are called sufficiently into question . . . the trial judge must determine whether the testimony has a reliable basis in the knowledge and experience of the relevant discipline." *Kumho*, 526 U.S. at 149 (cleaned up) (emphasis added). An expert may not choose to rely on certain data but ignore other relevant information in forming their opinion. *See EEOC v. Freeman*, 778 F.3d 463, 469 (4th Cir. 2015) (Agee, J., concurring) (collecting cases) ("[C]ourts have consistently excluded expert testimony that 'cherry-picks' relevant data."). And where "an expert merely offers his client's opinion as his own, that opinion may be excluded" as unreliable, because it "lack[s] . . . independent verification or analysis" and "cloaks unexamined assumptions in the authority of expert analysis." *Ask Chemicals, LP v. Comput. Packages, Inc.*, 593 F. App'x 506, 510 (6th Cir. 2014) (citation omitted). Scott's opinions are unreliable on several fronts.

***First***, an expert opinion must not rest purely on speculation. *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 670 (6th Cir.2010). But all Scott has in this case is speculation.

<u>Wheel Measurements</u>. In the first section of his report, Scott discusses the importance of having the correct wheel size in order to accurately report speed, but admits to having no evidence that the 41-inch wheel size reflected in the hard download conducted by Berghaus is incorrect. Ex. B, Ex. A at 75:17-20, 76:3-13. Similarly, in the third section of his report, Scott states that when performing a hard download, the relevant manager should input the proper wheel size. Ex. B.

Again, Scott has no evidence to refute Berghaus' testimony that he took the wheel measurement when performing the hard download in this case and admits that the hard download and the ERAD both show that Watts was speeding on January 13, 2018. Ex. A at 86:21-25, 90:21-25; Ex. C at 242:5-14. Finally, Scott admits to having no evidence regarding whether the ERAD determined the locomotive's speed based on the wheel size of the relevant locomotive from the its last maintenance cycle. Ex. A at, 85:7-14.

Measured Mile. Even though Scott opines that a speed test using a measured mile must be conducted every time a train is operated, (Ex. B), he nevertheless admits that there are segments of track that do not have measured miles. Ex. A at 80:22-24; 82:1-16. And he cannot point to any FRA requirement mandating that every segment of track must have a measured mile. Ex. A at 80:25-81:6. In preparing his opinion related to speed tests, Scott did not speak with anyone at CSX or anyone else about CSX's current practices regarding how engineers should operate a locomotive where there is no measured mile. Ex. A at 81:10-18. Importantly, Scott has not demonstrated any connection between this "opinion" and the facts of this case. Scott admits that Watts' use of the independent brake locomotive suggested that she knew she had been speeding. Ex. A at 78:15-22.

Simply put, there has been "no evidence presented in this case that provides a well-grounded [] basis to elevate" Scott's opinions "to the level of reliability required for expert testimony." *Galoski*, 2017 WL 2291431, at *2 (J. Nugent); s*ee also Dickerson v. CSX Transp., Inc.*, 2014 WL 545426, at *6 (W.D. Ky. Feb. 10, 2014) (excluding expert testimony based on "sheer speculation" that was "made simply to support this litigation").

**Second**, "proposed [expert] testimony must be supported by appropriate validation – *i.e.*, 'good grounds,' based on what is known." *Daubert*, 509 U.S. at 590. But Scott did not base his

opinion on a thorough review of the record. In fact, the only documents Scott reviewed before he prepared his report or sat for his deposition were: a few interrogatories and requests for production, the on-site investigation transcript of Watts in January 2018, the deposition transcript of Berghaus, a single CSX operating rule that he looked up online, and a one-page event recorder download. Ex. A at 51:20-52:16; 55:13-56:23; Ex. B at 2. Despite it being readily available through Watts' counsel, Scott did not review any portion of the transcript from the November 15 and 16, 2022 ALJ hearing, during which the relevant CSX managers and decisionmakers discussed the January 13, 2018 speeding incident, relevant CSX policies and procedures regarding ERAD and other downloads, and Watts' dismissal, at length. Scott considered none of this—rendering the "factual basis of his opinion" insufficient and, thus, his opinion unreliable. *United States v. Lang*, 717 F. App'x 523, 536 (6th Cir. 2017).

More egregious, Scott opines that "there is nothing in this case that I have read that would lead me to a conclusion that Watts was speeding" and that "the information produced by CSXT was not from a standard download from the event data recorder from CSXT locomotive 2057." Ex. B. But incredibly, ***Scott did not review the principal document related to the speeding incident in this matter – the ERAD reviewed by the independent decisionmaker—Rosselli – in deciding to discipline Watts and her conductor***. That is, Scott was under the false impression that the one page event recorder download document that he reviewed in preparing his report was the ERAD download. Ex. A at 50:18-25, 96:21-23. It was not; it was instead a one-page screenshot of the hard download that Berghaus obtained after receipt of the ERAD data, a fact Scott conceded when he was shown the actual ERAD download at issue during his deposition. Ex. A at 77:13-25, 96:21-23; Ex. D; Ex. E, ERAD Download; Ex. C at 201:8-202:21, 211:16-213:18, 242:5-8.

-13-

And, after reviewing the relevant ERAD download during his deposition Scott admitted that the fact that Watts applied her independent brake once she began to go 5 MPH over the speed limit "indicate[d] to [him] that she was trying to get her speed down." Ex. A at 78:15-22. Moreover, once shown the ERAD, Scott admitted that it and the hard download both show that Watts was speeding on January 13, 2018. Ex. A at 90:21-25.

In short, Scott's opinions amount to nothing more than sheer speculation based on a woefully inadequate review of the record and the Court should not admit Scott's testimony simply because Watts describes it as "expert."

### IV. CONCLUSION

For these reasons, this Court should exclude the opinions of Scott.

Dated: June 13, 2024

/s/ *Elaine Rogers Walsh*
Elaine Rogers Walsh (*pro hac vice*)
Patrick M. Corley (*pro hac vice pending*)
JONES DAY
1221 Peachtree Street, N.E., Suite 400
Atlanta, GA 30361
Telephone: 404.581.3939
Facsimile: 404.581.8330
Email: erogerswalsh@jonesday.com
       pcorley@jonesday.com

Yaakov M. Roth (*pro hac vice*)
JONES DAY
51 Louisiana Avenue, NW
Washington, D.C. 20001
Telephone: 202.879.3939
Facsimile: 202.626.1700
Email: yroth@jonesday.com

Elizabeth L. Dicus (No. 0081219)
JONES DAY
325 John H. McConnell Boulevard
Suite 600
Columbus, OH 43215
Telephone: 614.469.3939
Facsimile: 614.461.4198
Email: eldicus@jonesday.com

Samuel V. Lioi (No. 100464)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: 216.586.7135
Facsimile: 216.579.0212
Email: slioi@jonesday.com

## CERTIFICATE OF SERVICE

I hereby certify that on June 13, 2024, I caused the foregoing document to be emailed to counsel of record.

*/s/ Elaine Rogers Walsh*
Elaine R. Walsh