# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **DOROTHY GASIOROWSKI-WATTS,** | ) | **CASE NO.    1:23 CV 1043** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE DONALD C. NUGENT** |
| | ) | |
| **v.** | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| **CSX TRANSPORTATION, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

This matter is before the Court on the motion of Defendant CSX Transportation, Inc. ("CSX"), for Summary Judgment. (ECF #27). Plaintiff asserts one claim in this action, that Defendant disciplined her in retaliation for engaging in protected activity in violation of the Federal Rail Safety Act ("FRSA"), 49 U.S.C. §20109 *et seq*. For the reasons that follow, Defendant's Motion for Summary Judgment is granted.

## FACTUAL AND PROCEDURAL BACKGROUND[1]

Plaintiff was hired by CSX in August 1998 and worked primarily as locomotive Engineer or as a conductor in the Cleveland, Ohio area. A train crew is comprised of a locomotive engineer and a conductor. Engineers are primarily responsible for operating the locomotive engine, including inspection of the locomotive before operation and ensuring the safe movement of the train. The conductor is responsible for the groundwork such as arranging rail cars and conducting brake tests. As an engineer, the terms and conditions of Plaintiff's

---

[1] Except as otherwise cited, the factual summary is based on the Complaint and the parties' statements of fact.  Those material facts which are controverted and supported by deposition testimony, affidavit, or other evidence are stated in the light most favorable to the non-moving party.

employment were governed by the CBA between CSX and Plaintiff's union.

CSX engineers are subject to CSX's disciplinary policy known as IDPAP (an acronym for Individual Development & Personal Accountability Policy.) Under IDPAP, offenses which may result in discipline are classified as non-major or major. A single speeding incident of less than 10MPH over the speed limit during a three year period was typically classified as non-major. However, if an employee violated the same rule–including speeding–more than once in a three year period, the second incident was classified as a major offense. An employee could be dismissed for a single major offense but discipline for non-major violations would generally result in a suspension, not termination.

In July 2017, Plaintiff noticed that the locomotive she was operating was speeding less than 5 MPH over the posted speed limit for less than a minute. Plaintiff notified her direct supervisor of the overspeed incident at the end of her shift. Under the disciplinary procedure set forth in the CBA, when a manager believes that an employee may have violated CSX's Operating Rules, he enters an "assessment" into Field Administration's electronic system describing the circumstances of the employee's potential violation. Field Administration, a group of employees located at CSX Headquarters in Jacksonville, Florida, then reviews the assessment, the relevant operating rule, and the employee's history to determine whether a charge should be issued, and, if so, the classification of the misconduct. Field Administration then notifies the employee that she is being charged with a potential rule violation and schedules an investigation hearing to determine whether the rule violation occurred. Discipline may only be issued if an employee is found to be at fault after a fair and impartial hearing conducted under the terms of the applicable CBA, or after the employee waives her right to a

hearing and accepts responsibility for the charged offense. If an employee proceeds to an investigation, she has the right to be represented by a union official, and can give testimony, present documentary evidence, examine witnesses, and make statements on her own behalf. The investigation hearing is presided over by an impartial CSX manager, known as a hearing officer, who does not make discipline decisions. Field Administration then sends the hearing transcript and exhibits to a higher level CSX manager not involved in the underlying incident or hearing, who decides whether the employee violated CSX's Operating Rules and, if so, the appropriate discipline to impose.

With respect to Plaintiff's self reported July 2017 overspeed incident, Field Administration classified the offense as non-major because Plaintiff had no previous speeding violations within the last three years, and scheduled a formal hearing. Plaintiff elected to waive the hearing, admitted responsibility for the speeding violation, and accepted a formal reprimand.

On January 13, 2018, CSX's ERAD system detected that the train that Plaintiff was operating at the time was traveling more than 5 MPH over the posted speed limit. CSX locomotive engines are equipped with event recorders which continually document various aspects of a locomotive's operation, including speed. The ERAD system communicates electronically with receivers at various points along the tracks, and notifies CSX's ERAD team in Jacksonville of any potentially unsafe events such as overspeed. The ERAD team reviews the communications and the underlying data and, when the data confirms an unsafe operating condition, forwards the data to local managers for review and follow up. On January 16, 2018, Plaintiff's manager, Michael Berghaus, who was a Manager of Train Operations at the CSX

-3-

Cleveland terminal at that time, was notified of the incident by the ERAD team. The ERAD alert email identified the train crew involved in the incident, Plaintiff as the engineer and J.E. Dembiec as the conductor, and indicated that the locomotive was speeding for a total of 683 feet for 34 seconds, reaching a peak speed of 15. 75 MPH for about 4 seconds. The speed limit on that section of track was 10 MPH.

Once Mr. Berghaus received the ERAD alert, he was required to respond and enter an assessment if the data showed the train was in fact speeding. Unless the field manager can disprove the data documented in an ERAD alert, he is required to input an assessment into the Field Administration system. Here, Mr. Berghaus analyzed the ERAD data, confirmed that it showed Plaintiff speeding, and then analyzed Plaintiff's locomotive reports showing that Plaintiff had not raised an issue with the locomotive's speedometer. Berghaus also pulled the "hard download" data directly from the locomotive, which matched the ERAD data and further showed that the crew actively applied the "independent brakes" showing they realized that the train had been speeding. Because Mr. Berhaus' review of the ERAD data substantiated that the crew exceeded the speed limit by over 5 MPH, Bergaus entered an assessment for both crew members for a potential violation of CSX's Operating Rule 300.2. The Field Administration in Jacksonville reviewed the assessments and concluded that under the IDPAP, charges should be issued. Field Administration classified the charges as: (1) a potential non-major offense against Dembiec because he had no prior speeding violations within three years; and (2) a potential major offense against Plaintiff because it was her second speeding violation within three years. Charge letters were issued to both Plaintiff and Dembiec, notifying them that CSX would hold an investigation hearing to determine whether they had operated their train over the authorized

-4-

speed limit in violation of CSX's Operating Rules. Consistent with the IDPAP, Plaintiff was held out of service pending the investigation since she was charged with a major offense.

At the investigation hearing on January 24, 2018, Plaintiff was represented by a union officer and was permitted to present testimony and evidence on her own behalf and cross examine CSX's witnesses. Plaintiff testified that she did not believe she was speeding and that the download must have been inaccurate. Her union representative entered two outdated ERAD memoranda and claimed that speeding infractions of less than a minute did not warrant discipline. Mr. Berghaus testified for CSX and explained that the memoranda were no longer in effect. He also explained how the ERAD data demonstrated that Plaintiff had been speeding, in violation of CSX operating rules. Plaintiff did not raise any claim at the hearing that she was being retaliated against for reporting safety concerns.

In accordance with CSX disciplinary procedure, the discipline decision was made by a different higher level manager, Shaun Rosselli who reviewed the investigation hearing transcript and exhibits and made his own analysis of the ERAD data. Mr. Rosselli determined that the locomotive reached a speed of 15.75 MPH when the speed limit was 10 MPH and that the duration of the overspeed did not matter. As such, Mr. Rosselli concluded that Plaintiff had committed the major rule violation with which she was charged and that she should be dismissed. Mr. Rosselli also determined that Mr. Dembiec was culpable for the overspeed – in his case a minor rule violation since he had no other speeding violation within three years--and should be suspended for 15 days.

Plaintiff arbitrated Mr. Rosselli's decision that she was speeding and on Jan. 20, 2020,

the Public Law Board concluded that Plaintiff had violated Operating Rule 300.2 by operating her locomotive over the authorized speed but due to mitigating factors, including the fact that Plaintiff brought the speed of the locomotive into compliance within 34 seconds and had 20 years of service, reinstated Plaintiff to her position with seniority unimpaired but no payment for time lost.

Plaintiff asserts that CSX disciplined her in retaliation for her continual reporting of safety violations. Plaintiff was elected to union office in 2009 and thereafter held the positions of Vice President and Secretary/Treasurer. When she was vice president, Plaintiff states that she made verbal complaints about safety issues to her direct supervisors or any other company official at her terminal. She also notes that part of her duties as the secretary/treasure was to write up safety reports and send them to CSX trainmasters. She states that she would turn in reports for herself and others and it became common knowledge that she regularly reported hazardous conditions in the workplace. In November and December 2017, Plaintiff asserts that she faxed Unsafe Condition or Defective Equipment reports to the Collinwood Yard office and addressed them to Mr. Berghaus. In December 2017, Plaintiff states that she called the Federal Railway Administration to report Mr. Berhaus for violating the Hours of Service Act when he worked as a pilot on a job. Plaintiff states that she told Mr. Berghaus on the night of the incident that she was going to report him.

## STANDARD OF REVIEW

Summary judgment is appropriate when the court is satisfied "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden of showing the absence of any such "genuine

issue" rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citations omitted). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. The court will view the summary judgment motion in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of their case. *Tolton v. American Biodyne, Inc.,* 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322). Accordingly, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (citing *Anderson*, 477 U.S. at 252). Moreover, if the evidence presented is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment. *Anderson*, 477 U.S. at 249-50 (citations omitted). In most civil cases involving summary judgment, the court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id.* at 252. However, if the non-moving party faces a heightened burden of proof,

such as clear and convincing evidence, it must show that it can produce evidence which, if believed, will meet the higher standard. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).

Once the moving party has satisfied its burden of proof, the burden then shifts to the non-mover. The non-moving party may not simply rely on its pleadings, but must "produce evidence that results in a conflict of material fact to be solved by a jury." *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995). Evidence may be presented by citing to particular parts of the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials. Fed. R. Civ. P. 56(c). In lieu of presenting evidence, Fed. R. Civ. P. 56(c) also allows that a party may show that the opposing party's evidence does "not establish the presence of a genuine dispute" or that the adverse party "cannot produce admissible evidence to support the fact."

According to Fed. R. Civ. P. 56(e),

[i]f a party fails to properly support an assertion of fact, or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:
(1) give an opportunity to properly support or address the fact;
(2) consider the fact undisputed for purposes of the motion;
(3) grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it; or
(4) issue any other appropriate order

In sum, proper summary judgment analysis entails "the threshold inquiry of determining whether there is the need for a trial--whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be

resolved in favor of either party." *Anderson*, 477 U.S. at 250.

## DISCUSSION

Plaintiff asserts that she was terminated by CSX in retaliation for engaging in protected activity in violation of FRSA. Specifically, Plaintiff contends that her history of reporting hazardous safety issues in the workplace, as well as notifying her immediate supervisor Berghaus that she was reporting him to the Federal Railroad Administration for violating the Hours of Service Act, were contributing factors in CSX's adverse action against her. In order to establish a retaliation claim under the FRSA, a plaintiff must show:

> '(1) he engaged in protected activity; (2) the employer knew that he engaged in protected activity; (3) he suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable personnel action.'

*Mangold v. Norfolk S. Ry. Co.*, No. 21-3059, 2021 WL 5904091, at *3 (6th Cir. Dec. 14, 2021) *quoting Consolidated Rail Corp. v. United States Dep't of Labor,* 567 F. App'x 334, 337(6th Cir. 2014) (*citing Araujo v. New Jersey Transit Rail Operations, Inc.*, 708 F.3d 152, 157 (3d Cir. 2013)). Once a plaintiff makes a prima facie case that the protected activity was a contributing factor to the unfavorable personnel action, the defendant must prove "by clear and convincing evidence that it would have taken the same adverse action in the absence of any protected behavior." *Id.* (Citations omitted.) Failure to satisfy any one of the prima facie requirements is fatal to a claim. *Lockhart v. Long Island R.R. Co.*, 266 F. Supp. 3d 659, 663 (S.D.N.Y. 2017), *aff'd sub nom. Lockhart v. MTA Long Island R.R.*, 949 F.3d 75 (2d Cir. 2020)

CSX argues that Watts has failed to establish the second and fourth elements of her prima facie case because she cannot prove that the relevant CSX decision makers knew or

suspected that she engaged in protected activity and because she has not proven that any alleged protected activity was a contributing factor in CSX's decision to dismiss her.[2] Even if Plaintiff had established a prima facie case, CSX argues that it has proven its affirmative defense that it would have disciplined Plaintiff even if she had not engaged in any conduct protected by the FRSA.

**1. Prima Facie Case**

Starting with the second element of the prima facie case, plaintiff must show that the relevant decision makers knew that she engaged in protected activity. *See Mangold*, 2021 WL 5904091 at *4. Here, Plaintiff has stated that her manager Mr. Berghaus was aware that she had submitted numerous safety complaints – she frequently faxed complaints about safety conditions to the trainmaster's office where Mr. Berghaus worked at least a couple days per week. Many of her complaints were directly addressed to Berghaus. Plaintiff further stated that she followed up on her written safety complaints by asking supervisors about whether the safety issues were addressed in daily safety briefings in which Berghaus was frequently on the calls. Finally, in December, 2017 Plaintiff told Mr. Berghaus that she was reporting him to the FRA for an hour of service violation.

Defendant responds that Plaintiff cannot show that her 2017 complaint forms addressed to Berghaus were ever sent, and even if they were, she does not know whether anyone, including Berghaus, ever received the forms. Berghaus testified that he did not receive the 2017

---

[2]

The parties agree that Plaintiff has satisfied the first and third elements of the prima facie test–she has engaged in protected activity over the course of her employment with CSX and suffered an unfavorable personnel action when she was terminated.

forms. While one of Plaintiff's 2017 forms concerned a safety issue at the Duraline site, Berghaus said he became generally aware of the issue through inspecting the area himself and does not recall specifically speaking with Plaintiff about it. While Plaintiff states that she called the FRA on December 17, 2017 regarding Berghaus' alleged hour of service violation, the FRA has no record of any contact from Plaintiff "in or around December 2017" and Berghaus says that he has no knowledge regarding Plaintiff's alleged report and does not recall any such conversation.

However, even assuming Mr. Berghaus was aware of Plaintiff's protected activity, the overspeed incident was discovered by ERAD, not Berghaus and under the applicable CSX rules, Berghaus, as the immediate manager, was required to input an assessment if the ERAD data substantiated an overspeeed. At that point, Field Administration, not Berghaus, issued the charge letter to Plaintiff and classified the charge against Plaintiff as major. There is no evidence that Field Administration, the charging entity, was aware of any safety complaints made by any employee, including Plaintiff. Thus, while Berghaus entered the assessment and provided evidence at the hearing supporting the validity of the ERAD data, he is not the relevant decision maker for the purpose of establishing the prima facie case. *See Hand v. CSX Transportation, Inc.*, 2021 WL 963584 at *8 (N. D. Ohio Mar. 15, 2021)(court concluded that the decision to assess an employee is separate and apart from the relevant decision– the decision to discipline an employee.) The relevant decision maker regarding asserting the charge was Field Administration and the relevant decision maker of whether Plaintiff violated an Operating Rule and the discipline to be imposed as a result was Mr. Rosselli. There is absolutely no evidence that Mr. Roselli had any knowledge of Plaintiff's protected activity and

-11-

he did not consult with anyone, including Mr. Berghaus, when deciding whether to discipline Plaintiff or her conductor. Rather, Mr. Rosselli stated that he made his decision based on his review of the hearing transcript and exhibits (which did not include any reference to Plaintiff's protected activity) and his own analysis of the ERAD data. As such, Plaintiff has failed to demonstrate that the relevant decision maker had knowledge of her protected activity.

Moving to the fourth element of the prima facie case, a Plaintiff must show that her protected activity was a contributing factor in the unfavorable personnel action. *Mangold*, 2021 WL 5904091, at *3. The contributing factor standard "has been understood to mean any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision." *Hand v. CSX Transportation, Inc.*, No. 1:19-CV-941, 2021 WL 963584, at *7 (S.D. Ohio Mar. 15, 2021) *quoting Consol.Rail Corp. v. U.S. Dep't of Labor*, 567 F. App'x 334, 338 (6th Cir. 2014). This factor requires a plaintiff to provide evidence of retaliatory animus against him. A contributing factor need not be the sole factor causing the adverse action. The FRSA prohibits adverse actions done "in whole or in part" in retaliation for protected acts. 49 U.S.C. § 20109(a). Circumstantial evidence of a contributor factor can include any of the following:

> temporal proximity, indications of pretext, inconsistent application of an employee's policies, shifting explanations for an employer's actions, antagonism or hostility toward a complainant's protected activity, falsity of an employer's explanation for the adverse action taken, and change in the employer's attitude toward the complainant after he engages in protected activity.

*Id*. at *7 *quoting Mangold v. Norfolk S. Ry. Co.*, 2020 WL 7334679 at *8 (N.D. Ohio Dec. 14, 2020).

Plaintiff contends that her long history of protected activity and the push back she

received from CSX managers earlier in her career, combined with the temporal protected activity involving Berghaus in December 2017, Berghaus's handling of the 2018 ERAD alert, and the difference in the way she is treated when she does not engage in protected activity all combine to show that Plaintiff's protected activity was a contributing factor in her 2018 dismissal.

Plaintiff states that she has had a target on her back and has been closely scrutinized ever since she took union office and started reporting safety issues. She notes that she had little contact or knowledge of managers before she became a union officer and notes that she has been left alone since she was returned to service and stopped submitting safety reports in 2022.. Plaintiff reports an instance in 2012 of a manager threatening her to stop reporting safety issues or he would fire her and her subsequent dismissal. She was returned to work and continued her protected activity. While most of the protected activity noted by Plaintiff was not in temporal proximity to her 2018 dismissal, she notes that she faxed Berghaus safety complaints about a month before the 2018 incident and reported him to the FRA for the alleged hours of service violation. She contends that this temporal proximity and Berghaus' alleged failure to validate the ERAD data before filing the assessment is her strongest evidence of retaliatory motive.

While Plaintiff contends that Berghaus did not validate the ERAD data before issuing an assessment against her, the evidence does not support her contention. There is no evidence Berghaus acted outside the requirements of CSX procedure in validating the ERAD data and issuing an assessment. Specifically, Plaintiff claims that Berghaus failed to take any steps to validate the speed shown in the ERAD alert. She notes that there was no measured mile on the territory so the speedometer could not be calibrated by the crew and Berghaus did not use a radar gun to check the speedometer on the unit or produce any evidence that he completed a

calculation based on the wheel diameter to verify the speed. However, as explained by Berghaus at the investigation hearing and the November 2022 ALJ hearing, he took several steps to confirm that the data from the ERAD alert was accurate. Berghaus took the GPS locations in the ERAD alert and entered the specific latitudes and longitudes on a separate internal mapping system to verify where the locomotive was located and the speed at the relevant time period by referencing CSX's timetables. As part of that review, the data showed that the crew actively applied the independent brakes, demonstrating that Plaintiff and her conductor realized that the locomotive was speeding. In addition, Berghaus downloaded the data directly from the locomotive from the time of the incident, measured the locomotive's wheel, and saw that this download matched the ERAD data. Finally, Berghaus pulled and reviewed the locomotive work reports completed by Plaintiff the day of and the day before the overspeed incident which contained no reported issues, including for the speedometer. As a result, Bergaus testified that he had no doubt that the train's speedometer was functioning properly at the time of the overspeed.[3] It is clear that Berghaus followed CSX procedure and his actions in validating the ERAD alert were proper and do not show retaliatory motive.

Plaintiff tries to import Berghaus' alleged retaliatory animus to Rosselli arguing that while Rosselli may have honestly believed that Plaintiff violated a speeding rule, his "belief" was based on the evidence supplied by Berghaus. As described above however, Rosselli, who

---

[3] Plaintiff also complains that Berghaus explained at the investigation hearing that he completed a hard download from the locomotive but did not introduce the download as an exhibit. Berghaus did not introduce the hard download as an exhibit because the data from the ERAD and hard download come from the same place and are the same. The hard download was produced to Plaintiff and introduced at the ALJ hearing, although some keystroke errors resulted in the title not matching Plaintiff's locomotive. However, the substantive information was correct.

had no knowledge of Plaintiff, her history of protected activity or her working situation, analyzed all of the evidence independently and determined that Plaintiff had committed a major rule violation and issued discipline in accordance with that finding. There is no evidence in the record to indicate that Berghaus advised Rosselli or otherwise influenced him in his decision making. Plaintiff's attempted bootstrap argument does not show that retaliatory animus was a contributing factor in Rosselli's analysis and disciplinary decision. The mere fact that a plaintiff has engaged in protected activity does not shield her from discipline if she committed a rule violation. *See Lemon v. Norfolk So. Ry. Co.*, 958 F.3d 417, 420-21 (6th Cir. 2020)(FRSA protected conduct does not immunize employees from discipline for wrongdoing.)

Ultimately, Plaintiff has failed to demonstrate her prima facie case because the relevant decision maker who determined that Plaintiff had violated a major rule and imposed discipline had no knowledge of Plaintiff's protected activity. Moreover, Plaintiff has not demonstrated that retaliatory animus was a contributory factor in her discipline. As such, her FRSA retaliation claim fails as a matter of law.

**2. CSX Affirmative Defense[4]**

CSX argues that even if Plaintiff had demonstrated a prima facie case, CSX would still be entitled to summary judgment because the evidence clearly and convincingly demonstrates that it would have dismissed Plaintiff for her major rule violation even if she had not engaged in protected conduct. 49 U.S.C.A. § 20109(a). In assessing whether CSX has made this clear

---

[4] Because Plaintiff has failed to establish a prima facie case of retaliation, the Court is not required to consider whether CSX would have taken the same adverse action in the absence of any protected activity. *Gibbs v. Norfolk Southern Ry Co.*, 2018 WL 1542141 at *10 (W.D. Ky Mar. 29, 2018): *Conrail*, 567 Fed. Appx. at 337. Nevertheless, the Court will address CSX's "same action" defense for the sake of completeness.

and convincing showing, courts consider the following non-exclusive factors: (1) whether the railroad has written polices addressing the alleged misconduct; (2) whether the railroad followed the applicable investigatory and disciplinary procedures; (3) whether the dismissal was approved by senior management; (4) the temporal proximity between the non-protected conduct and the adverse actions and (5) whether the railroad consistently enforces the policies and rules at issue. *See Dafoe v. BNSF Railway Co.*, 164 F.Supp.3d 1101, 1116 (D. Minn. 2016). At bottom, "[a]n employee who engages in protected activity is not insulated from adverse action for violating workplace rules, and an employer's belief that the employee committed misconduct is a legitimate, non-discriminatory reason for adverse action." *Richey v. City of Independence*, 540 F.3d 779, 784 (8th Cir. 2008).

CSX has put forth evidence which demonstrates that the decision to terminate Plaintiff's employment after her second overspeed violation within three years is consistent with CSX's written policies. Further, there is a close temporal proximity between CSX's discovery of Plaintiff's second speeding violation and its decision to terminate her. CSX acted in compliance with the strict time limits set forth in Plaintiff's CBA. The overspeed incident at issue occurred on January 13, 2018, and the investigation was complete and the discipline decision was issued on February 23, 2018.  CSX presented evidence that it treated Plaintiff consistently with other CSX employees who were disciplined for operating their locomotive between 5 and 9.99 MPH over the authorized speed limit for less than a minute during the relevant time period (2017-2018). The employees who had violated the overspeed rule twice within a three year period were dismissed. The employees who had not committed a speeding offense within the past three years, were suspended, like Plaintiff's conductor, Dembiec. The disciplinary decision maker Rosselli explained his decision and his process which were

unrelated to any previous protected activity by Plaintiff. The discipline imposed was consistent with CSX written disciplinary rules and was clearly unrelated to any protected activity of Plaintiff. While Plaintiff may feel that she should have been offered some leniency, "courts do not act as a super-personnel department' and re-examine an employer's disciplinary decisions." *Mangold*, 2021 WL 5904091 at *5.

In this case, under these circumstances, CSX has submitted clear and convincing evidence that it would have discharged Plaintiff for her second overspeed violation in three years even if she had never engaged in protected activity.

## CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment (ECF #27) is granted. IT IS SO ORDERED.

DONALD C. NUGENT
United States District Judge

DATED: *September 25, 2024*